**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
SETH MITCHELL,

                     Plaintiff,

         *-against-*

The Goldman Sachs Group, Inc.;
CIGNA Corporation;
American International Group, Inc.;
Hewitt Associates LLC;
The City of New York;
The New York Police Department;
The Fire Department of the City of New York;
New York-Presbyterian/Weill Cornell Medical
Center/The Payne Whitney Clinic;
Peter Solmssen, Esq.; Nicole Jones, Esq.;
Edith Cooper; John Murabito; Conrad Naas;
Gena Palumbo, Esq.; James Saunders, Esq.;
James Daly; Katherine O'Neill; Vicki Bichel;
Susan Wantland; Dominick Di Lillo; Jordan
Mazur; Kimberly Miller; Leah Calabria;
Melanie Dougherty; Andrew Sonpon Jr., Esq.;
John Timmerberg;
John & Jane Does 1 – 1000

                    Defendants.

-------------------------------------------------------X

UNITED STATES OF
AMERICA SOVEREIGN
COMPLAINT

*Jury Trial Requested*

17CV 6258

# INITIAL COMPLAINT

RECEIVED
SDNY PRO SE OFFICE
2017 AUG 17 PM 12:40
S.D. OF N.Y.

## I.     PARTIES

### A.     Plaintiff Information

1.     Seth Mitchell, **Self-Represented, Sole Claimant, Plaintiff-Prosecutor**
208 East 51st Street, Suite 391, New York County, New York, 10022
Direct dial: 1.646.801.2045
Email address: seth.mitchell@ashemllc.co

### B.     Defendants' Information

#### a.     *Entity Defendants*

1.     The Goldman Sachs Group, Inc. (Ticker: GS)
200 West Street, New York County, New York, 10282
Direct dial: 1.212.902.1000

2.     CIGNA Corporation (Ticker: CI)
900 Cottage Grove Road, Bloomfield, Connecticut, 06002
Direct dial: 1.860.226.6000

3.     American International Group, Inc. (Ticker: AIG)
175 Water Street, New York County, New York, 10038
Direct dial: 1.212.770.7000

4.     Hewitt Associates LLC (Ticker: AON)
4 Overlook Point, Lincolnshire, Illinois, 60069-4302
Direct dial: 1.847.295-5000

5.     The City of New York
c/o Zachary Carter, Corporation Counsel of the City of New York
The Office of the Corporation Counsel
100 Church Street, New York County, New York, 10007
Direct dial: 1.212.356.0803
Email: zcarter@law.nyc.gov

6.     The New York Police Department
Attention: Civil Section, Legal Bureau, Room 1406
One Police Plaza, New York County, New York, 10038
Direct Dial: 1.646.610.5400

7.     The Fire Department of the City of New York

（あ）

Attention: FDNY Bureau of Legal Affairs
9 MetroTech Center – Room 8E-4, Brooklyn, New York, 11201-3857
Direct dial: 1.718.999.0691

8.  New York-Presbyterian/Weill Cornell Medical Center/The Payne Whitney Clinic
525 East 68th Street, New York County, New York, 10065
Direct dial: 1.888.694.5700

**b.  *Individual Defendants***

9.  Peter Solmssen, Esq., Executive Vice President & General Counsel
American International Group, Inc.
175 Water Street, New York County, New York, 10038
Direct dial: 1.212.770.7000
Email: Peter.Solmssen@aig.com

10. Nicole Jones, Esq., Executive Vice President & General Counsel
CIGNA Corporation
900 Cottage Grove Road, Bloomfield, Connecticut, 06002
Direct dial: 1.860.226.6000
Email: nicole.jones@cigna.com

11. Edith Cooper, Executive Vice President & Global Head of Human Capital Management
The Goldman Sachs Group, Inc.
200 West Street, New York County, New York, 10282
Direct dial: 1.212.902.1000
Email: edith.cooper@gs.com

12. John Murabito, Executive Vice President, Human Resources and Services
CIGNA Corporation
900 Cottage Grove Road, Bloomfield, Connecticut, 06002
Direct dial: 1.860.226.6000
Email: john.murabito@cigna.com

13. Conrad Naas, Chief Claims & Operations Legal Officer, Commercial and Personal Insurance
American International Group, Inc.
175 Water Street, 15th Floor, New York County, New York, 10038
Direct dial: 1.212.458.9153
Email: Conrad.naas@aig.com

14. Gena Palumbo, Esq., Managing Director & Associate General Counsel

The Goldman Sachs Group, Inc.
200 West Street, New York County, New York, 10282
Direct dial: 1.212.357.2191
Email: gena.palumbo@gs.com

15. James Saunders, Esq., FDNY Health Care Compliance & HIPAA Privacy
Officer, The New York City Fire Department
Office of Health Care Compliance, FDNY Bureau of Legal Affairs
9 MetroTech Center, Rm. 8E-4, Brooklyn, New York 11201-3857
Direct dial: (718) 999-0691
Email: James.Saunders@fdny.nyc.gov

16. James Daly, Human Capital Management Division
The Goldman Sachs Group, Inc.
200 West Street, New York County, New York, 10282
Direct dial: 1.212.902.1000
Email: james.daly@gs.com

17. Katherine O'Neill, Human Capital Management Division
The Goldman Sachs Group, Inc.
200 West Street, New York County, New York, 10282
Direct dial: 1.212.902.1000
Email: Katherine.oneill@gs.com

18. Vicki Bichel, Assistant Vice President, AIG Personal Accident Claims
The American International Group, Inc.
17300 West 119th Street, Olathe, Kansas, 66061
Direct dial: 1.913.495.3289
Email: Vicki.Bichel@aig.com

19. Susan Wantland, Major Loss Examiner, Personal Accident Claims, Americas
Region, Consumer Lines/AIG Property Casualty
The American International Group, Inc.
17300 West 119th Street, Olathe, Kansas, 66061
Direct dial: 1.913.495.3278
Email: Susan.Wantland@aig.com

20. Dominick Di Lillo, Principal Investigator, Special Investigations Unit,
Global Investigative Services, AIG Property & Casualty
The American International Group, Inc.
17300 West 119th Street, Olathe, Kansas, 66061
Direct dial: 1.908.577.4721
Email: dominick.dilillo@aig.com

21.     Jordan Mazur, Sergeant, Records Access Appeal Officer
        The New York Police Department
        1 Police Plaza, Room 1406, New York County, New York, 10038
        Direct dial: 1.646.610.5443
        Email: Jordan.mazur@nypd.org

22.     Kimberly Miller, Claims Examiner
        The American International Group, Inc.
        17300 West 119th Street, Olathe, Kansas, 66061
        Direct dial: 1.913.495.3261
        Email: Kimberly.miller@aig.com

23.     Leah Calabria, Long Term Disability Team Leader
        CIGNA Corporation
        Two Liberty Place, 1601 Chestnut Street, Philadelphia, Pennsylvania, 19192
        Direct dial: 1.800.238.2125, X5059265
        Email: leah.calabria@cigna.com

24.     Melanie Dougherty, Social Worker
        CIGNA Corporation
        900 Cottage Grove Road, Bloomfield, Connecticut, 06002
        Direct dial: 1.888.244.6293, X353704
        Email: melanie.dougherty@cigna.com

25.     Andrew Sonpon Jr., Esq., Assistant Counsel
        The New York City Fire Department
        9 MetroTech Center, Brooklyn, New York 11201
        Tel. 1.718.999.0835
        Andrew.Sonpon@fdny.nyc.gov

26.     John Timmerberg, Principal Investigator – Major Case Unit, Global
        Investigative Services, North American – SUI
        The American International Group, Inc.
        17300 West 119th Street, Olathe, Kansas, 66061
        Direct dial: 1.913.313.9159
        Email: john.timmerberg@aig.com

27.     John & Jane Does 1-1000

## II.     STATEMENT OF CLAIM

## A.     Places & Dates of Occurrence

1.    70 Robinson Road, Unit 45F, Midlevels, Hong Kong, China, July 2001 – November 2003 (*Plaintiff's Corporate Luxury Residence via The Goldman Sachs Group, Inc. International Staff Program*)

2.    Goldman Sachs (Asia) LLC, The Center, 30th Floor, 99 Queen's Road, Central, Hong Kong, People's Republic of China, July 2001 – November 2003 (*Plaintiff's Primary Office location during his international assignment on The Goldman Sachs Group, Inc. International Staff Program*)

3.    Various, Tokyo, Japan, January 2002 – January 2003

4.    Various, Bangkok, Thailand, January 2002 – November 2003

5.    TRUMP International Hotel & Tower, One Central Park West, New York County, New York, 10023, 14 June 2003 (*Plaintiff's prepaid luxury hotel suite #724*)

6.    Inn at Irving Place, 56 Irving Place, New York County, New York, 10003, 1 July 2003 (*Plaintiff's prepaid luxury hotel suite Floor #2*)

7.    New York-Presbyterian/Weill Cornell Medical Center/The Payne Whitney Clinic, 525 East 68th Street, New York County, New York, 10065 (*Place of Plaintiff's illegal incarceration, stolen by NYPD and FDNY from luxury and forced into destitution, impoverishment, and homelessness*)

8.    Additional global incident locales, if any, to be provided upon results of discovery process.

**B.    Statement of Facts in Support of Claim**

**1.    PLAINTIFF'S *BONE FIDES***

Good Plaintiff–Prosecutor is Seth Mitchell, a naturally–borne Citizen of the United States of America from Queens County, New York.  He is first-borne Grand Son to Henry M. Sandler, United States Veteran Patriot (World War II, European Theatre of Operations: United Kingdom, France; Bronze Star Medal – New Issue 2014, Purple Heart – New Issue 1945, Reaffirmed 2014, Chevalier de la Légion D'Honneur of the Republic of France – New Issue 2014).  He is Great-Great Grand

Son to Joseph Eiten, proper landowner in New London, Connecticut from 1892 via direct participation with the Baron Maurice de Hirsch [Fund] resettlement initiatives. He earned his Bachelor of Science in Economics from Cornell University (Dean's List) (*Ithaca, New York*) and his Master of Business Administration from the Wharton School of the University of Pennsylvania (*Philadelphia, Pennsylvania*). He retains the investment industry's most prestigious, sought-after, and difficult to obtain certification, The Chartered Financial Analyst ("CFA") designation. He maintained gainful employment with such top-notch global financial services firms as The Goldman Sachs Group, Inc. where he was employed in the Firm's highly prestigious and lucrative Global Special Situations Group in the Asia Pacific region where he lived and worked for five (5) years. He is formally credit – trained and is an expert in the research, analysis, valuation, and adjudication of a variety of corporate and legal claims.

He has significant hands-on litigation experience, having asserted a variety of meritorious civil and criminal litigation claims in such matters as *Seth Mitchell v. Cantor Fitzgerald, L.P., et al.* (New York County Index No. 108597/2011, $US13 Million Default Claims, *uncured*) and *Seth Mitchell v. New York University, et al.* (New York County Index No. 150622/2013, $US49 Million Default Claims, *uncured*).

He successfully completed a United States Federal civilian employment assignment, having worked as a Field Operations Supervisor for the United States Department of Commerce 2010 Census activities where he managed approximately 100 employees in efficaciously completing all large-scale project operations in the field on a timely basis.

## 2. EMPLOYMENT WITH THE GOLDMAN SACHS GROUP, INC. & INCIDENTS WHICH LED TO HIS PERMANENT DISABILITIES, DESTITUTION, IMPOVERISHMENT, LONG-TERM HOMELESSNESS

On 3 July 2001, Plaintiff began his employment as an Executive Director (Vice President) with The Goldman Sachs Group, Inc. based in Hong Kong, China, as discussed in BONE FIDES. His high-profile employment role was under extensive formal lucrative contract (enclosed herewith as **Exhibit A**) and his

service covered in full under The Goldman Sachs Group, Inc. ("GS") *International Staff Program*" which, for all intents and purposes, made Plaintiff (*synthetically*) a United – States based employee in every way, shape, and form.  For instance, in 2003, he benefited from: a $US2,340.00 "*home leave allowance*" to defray personal travel expenses back to The United States of America, a "*cash housing allowance*" of $US13,752.00 for non-lease ancillary residential expenses, a $US37,365.00 cost of living ("COLA") adjustment benefit, GS-paid rent on his Luxury Corporate Residence of $US72,379.15, utilities reimbursement of $US2,280.00, full coverage in the "*U.S. Health Care Program*" (including Life and Accident & Disability [Quality of Life Protection] benefits) and "*U.S. Retirement Plan*" (including 401K Plan and Pension), and "global tax equalization" & tax preparation assistance via Ernst & Young paid by GS.

His high-profile relationship management role in the prestigious, strategically-vital, and highly lucrative Global Special Situations Group ("GSSG") required extensive global travel throughout Asia (mostly) and Europe (occasionally) to meet personally with firm-wide entity clients and counterparties to engage in high – value, sensitive discussions with the goal of advancing the formal GSSG commercial agenda.   For instance, his "best in class efforts" compelled him on extensive international travel to: Singapore, Indonesia, Malaysia, Philippines, Thailand, Japan, Australia, South Korea, England, Norway, Sweden, United States of America, where such exhaustive international business travel from Hong Kong occurred, on average, bi-weekly, to meet with such financial institutions, corporations, and other targeted commercial entities in line with proper professional decorum.

Beginning in mid-2002, Plaintiff became the targeted, purposeful victim of certain specific life-threatening maneuvers during business trips to Tokyo, Japan and Bangkok, Thailand, and locally in Hong Kong, China which included several instances of drugging and poisoning (Tokyo, Bangkok, and Hong Kong), economic

espionage via the theft of material non-public documentation such as mobile phone records (Hong Kong, at the Luxury Corporate Residence), and attempted murder (Bangkok, details of which remain private at this pleading stage to protect Plaintiff's privacy), many of which, but not all, were caused by an individual with whom Plaintiff had a significant personal relationship (known as the "Black Widow" strategy) and had been invited into the Luxury Corporate Residence. Plaintiff experienced very similar tragic (but not life-*ending*) injuries (specifically drugging/poisoning) under comparable circumstances as had been caused, tragically, to Robert Kissel by his wife Nancy Kissel as detailed in the Matter *HKSAR v. NANCY ANN KISSEL [2008] HKCA 387; CACC 414/2005 (6 October 2008)*, to be found at:

http://www.hklii.hk/cgi-bin/sinodisp/eng/hk/cases/hkca/2008/387.html?stem=&synonyms=&query=title(kissel

*(Mr. Kissel was well-known to Plaintiff as a contemporary, working in the same line of business as an American expatriate based in Hong Kong at the same time as Plaintiff.)*

Plaintiff was uncertain as to the cause of the symptoms he began to experience in 2002 – 2003 in disparate locales during these poisoning and drugging episodes, which included specific episodic bouts of extreme physical illness and severe intellectual incapacitation – none of which he had ever experienced before or since [2003] – and decided to return to The United States of America, New York County, New York in January 2003 for medical diagnostic and treatment and recuperation with full support of GS [Human Capital Management ("HCM") – the human resources function]. As he became asymptomatic (but still quite unwell) there, he then returned to Hong Kong from New York County, New York in April 2003 and whilst determined to resume working, was still unable to function in his high-level employment position given the illnesses, injuries, and sicknesses caused to him with heinous, malicious intent in Hong Kong, Tokyo, and Bangkok

previously.  Given his ongoing severe health degradation of which he was fully self-aware, he was compelled to return to The United States of America for a second time in May 2003 to find further medical treatment and engage in recuperation, after being physically unable to resume work in Hong Kong for GSSG.  During this second stay in New York County, New York, he slowly began to feel like himself again, and was planning on returning to Hong Kong in late-June 2003 to once again attempt to resume work in GSSG.

On 14 June 2003 via the placement of certain fraudulent "911 calls" by still as yet unnamed criminals to defendant The New York Police Department ("NYPD") (the "NYPD Job #0316606712" and the  "New York City Police Department Aided Report No. 00714", as detailed specifically in **Exhibit B**) at roughly 1130 EST, Plaintiff was illegally removed from his Private Luxury Hotel Suite #724 at TRUMP International Hotel & Tower ("TRUMP") and stolen from there, forced illicitly via transport by defendant The Fire Department of the City of New York ("FDNY") to "*New York-Presbyterian/Weill Cornell Medical Center/The Payne Whitney Clinic*" for some unknown, unconscionable reason.  There, he was subject to torturous, degrading, inconceivable and *illegal* confinement and *fraudulent* medical treatment, *impeding and delaying* his recuperation from his *actual* illnesses, injuries, accidents, and sicknesses and subsequent re-employment with GSSG in Hong Kong and *instead* infusing him with permanent disabilities of post-traumatic stress disorder ("PTSD"), anxiety and personality disorders, where such permanent disabilities since "have prevented him from engaging in each and every occupation or employment for compensation or profit for which he is reasonably qualified by reason of his education, training or experience".

On 1 July 2003 via the placement of fraudulent "911 calls" by still as yet unnamed criminals to defendant NYPD (the "NYPD Job #0318214833" as detailed in **Exhibit C**) at roughly 2255 EST, Plaintiff was once again illegally stolen from his Private Luxury Hotel Suite on Floor 2 at Inn at Irving Place ("Irving") and forced

against his will illicitly via transport by defendant The Fire Department of the City of New York ("FDNY") to "New York-Presbyterian/Weill Cornell Medical Center/The Payne Whitney Clinic" (see **Exhibit D** for proof of outstanding "Bill" to Plaintiff for the illegal FDNY transport, the "New York City Health Historical") for some unknown, unconscionable reason. There, he was subject to torturous, degrading, inconceivable and *illegal* confinement and *fraudulent* medical treatment, *impeding and delaying* his recuperation from his *actual* illnesses, injuries, accidents, and sicknesses and subsequent re-employment with GSSG in Hong Kong and *instead* infusing him with permanent disabilities of post-traumatic stress disorder ("PTSD"), anxiety and personality disorders, where such permanent disabilities since "have prevented him from engaging in each and every occupation or employment for compensation or profit for which he is reasonably qualified by reason of his education, training or experience".

The attached FDNY Ambulance Call Report #47412291 (**Exhibit E**) for the Irving incident contains perhaps the most damning evidence against The City [State] of New York defendants, whereby the Call Report's Chief Complaint [by victim/Plaintiff] is: "….***I WANT MY FREEDOM***…." (See Royal Blue Arrow, **Exhibit E**) thereby asserting his United States Constitutional rights [4th *Amendment to the United States Constitution, 14th Amendment to the United States Constitution*] that were once again violated purposefully by The City of New York after TRUMP. In fact, when approximately five NYPD employees illegally entered Plaintiff's Private Luxury Hotel Suite at Irving, the lead wrongdoing NYPD officer stated vindictively to Plaintiff "*this is quite a nice big hotel room you have here – you're coming with us now and we're going to take you to where you belong*" – *verbatim* – before stealing him away from his rightful *luxury* accommodation into the public streets, where he was then forced into the FDNY ambulance to be transported illegally to the hellacious torture chamber that is "New York-Presbyterian/Weill Cornell Medical Center/The Payne Whitney Clinic" once again for some unknown but certainly malevolent reason. Plaintiff *alleges*, and expects that upon completion of formal

discovery he will prove indubitably, that this global set of 2002-2003 incapacitations/incarcerations was a monstrous Strategy (in concert with the Black Widow strategy) for as yet unnamed criminals to unconscionably steal, unlawfully procure, illicitly abscond with, or otherwise sinisterly possess certain highly valuable assets which belonged to Plaintiff – which he has yet to recover as of this very day.

Adding atrocious insult to indelible injury, as per Plaintiff's attached 2003 American Express Platinum Charge Card Statement (**Exhibit F**), Plaintiff himself was compelled to pay personally *out-of-pocket* for the fraudulent medical services and permanently-disabling illegal internment (at *"New York-Presbyterian/Weill Cornell Medical Center/The Payne Whitney Clinic"*) in the sum total of $US3,507.00, in effect making good, innocent, law-abiding Plaintiff pay for the scandalous crimes committed purposefully against him by the GS defendants, the City of New York defendants, and the as yet unnamed GS-related criminals who initiated the fraudulent 911 calls against him.

The monstrous, disabling crimes at TRUMP and Irving in New York County, New York, combined with the poisoning/drugging/economic espionage/attempted murders in Hong Kong, Tokyo, and Bangkok in 2002 - 2003 left Plaintiff totally and permanently disabled to the extent he has been *unable* to obtain and maintain substantive gainful employment in *any* role commensurate with this educational background, employment experience, professional certifications, skills, abilities, and interests since; the outstanding controversy surrounding his accrued and unpaid Title II Social Security Benefits (2004 – Present) is now before the Court (*SDNY Index No. 16-CV-6588, Magistrate Judge Parker*) and the controversy surrounding the recent retaliatory discharge and additional associated wrongs at employer Macy's, Inc. is also now before this Court (*SDNY Index No. 17-CV-1845(CM), Chief United States District Judge McMahon*) (*for the first time since 2003, Plaintiff had permanent gainful employment as an onsite client-facing luxury*

*retail salesman at Macy's, Inc.'s Bloomingdale's, Inc. Division's Flagship Store in Luxury Home Products but was illegally separated in February 2017 after two years of employment; his average hourly rate at Bloomingdale's, Inc. was roughly $20/hour as compared to his average hourly rate during his last active year at GS in 2003 of roughly $US337.50/hour.  Plaintiff's 2017 total compensation at Macy's, Inc. was only 5.9% of his 2003 total compensation at GS.)*

3.   **VIOLATIONS OF 29 US CODE §1132(C)(1), THE SHERMAN ANTI-TRUST ACT OF 1890 [COLLUSION, CONSPIRACY, OBSTRUCTION, ANTI-COMPETITIVE BEHAVIOUR], 15 US CODE §45, PURPOSEFUL BREACH OF CONTRACT/TORTUOUS INTERFERENCE WITH CONTRACT BY GS, CIGNA CORPORATION, AMERICAN INTERNATIONAL GROUP, INC.; DOCTRINE OF CONTINUING VIOLATION**

It is a factual certainty that Plaintiff was severely, purposefully mishandled by GS (specifically HCM regarding his disability management/rehabilitation during the incapacitating events of 2002 - 2003) during and after his employment; to this day, he has made numerous, exhaustive written requests of GS for a full, complete accounting of his holistic suite of Benefits & Entitlements under the International Staff Program (from 2004 – Present); all requests for such specific, valuable information such as relevant specific Insurance Policies/Contracts have gone unanswered in full, when their provision would have been easily-transmitted to him via email with no burden or undue expense to GS whatsoever.  See **Exhibit G** for example of the formal written requests, sent to "GMS Americas" ("GMS" or Global Mobility Services is the arm of Human Capital Management that handles global staff movements) and defendant Cooper, who have failed to respond lawfully.  It must be clear to Court that, in fact, Plaintiff was *never* provided with the underling contracts for the Policies in question, even during is active employment with GSSG in Hong Kong, for both "individual' and GS-sponsored "group" policies, and as such, only GS could and should have facilitated his rightful filing of Claims under such Policy Contracts.

It literally took GS until 17 March 2016 to make a substantive good faith humane effort to abide by ERISA, the underlying Policy Contracts, and GS policy and procedure to provide Plaintiff with the vital information he had requested fairly and reasonably; Plaintiff received the "*Information Notice – Human Capital Management Rewards/Benefits*" (**Exhibit H**), dated 17 March 2016.  Of specific relevance is the incontrovertible fact that he maintained at least a generic benefit for: "LTD" (long-term disability) of $US180,000 *per annum*, "PAI" (personal accident insurance) of $US1,000,000 lump-sum benefit, and "BTA" (business travel/accident insurance) of $US2,000,000.00 lump sum benefit during his active employment period of July 2001 – November 2003.  Prior to 17 March 2016, Plaintiff was purposefully "kept in the dark" by GS over such valuable insurances, where the total actual accrued and unpaid amounts as of this Notice date were an astounding **$US5,190,000.00** (LTD @ $US15,000/month for 146 months = $US2,190,000 + $3,000,000 in total PAI/BTA payments).  Thereafter, Plaintiff's written requests for the *specifics* surrounding these insurance coverages and proper claim filing procedures associated with the LTD/PAI/BTA Plans went totally unanswered by GS, purposefully preventing him from Filing meritorious Claim under each Policy and resulting in the persistent deprivation of roughly **$US5.2 Million** in liquidity under such "Quality Of Life" Insurance Plans, all the while with GS, Cooper, Palumbo, O'Neill, and Daly (at least) knowing full well his utter destitution, impoverishment, and long-term homelessness due to the permanently incapacitating/disabling events of 2002 – 2003.

Though independent research with the United States Department of Labor, Plaintiff uncovered in May 2016 that, in fact, defendant American International Group, Inc. ("AIG") was the rightful Carrier under his PAI and BTA Insurance Policies via Policyholder GS.  Upon his receipt of this confirmatory information, Plaintiff *immediately* Filed a *generic* Claim for benefits with AIG on 4 May 2016 given the GS failure to provide the *specifics* of the Plans and Insurance Contracts/Policies.  On 31 October 2016 – a full five (5) months later – he received

the *first* valuable communication from AIG regarding the submission of his 4 May 2016 Claim Filing via an acknowledgment Letter sent via email from Wantland, where such Letter detailed specific Policy and Claim Numbers for the policies in effect under which Plaintiff was in fact both Eligible and Covered.  This delayed response was due solely to GS obstructive wrongdoing, as per another internal message at AIG from Claims employee Rachel Batson:

**05/23/2016 by RAQUEL BATSON, FCC, FT, MISC, GENERAL NOTE, FINAL, Confidential to ; Intellirisk \*\*"PER GOLDMAN SACHS: NO INFORMATION SHOULD BE SHARED WITH THIS PERSON CONCERNING BENEFITS"\*\***

Subsequently to her first email to him, Wantland was, for the most part, extremely uncooperative with Plaintiff regarding the timely processing and payout of the PAI and BTA Claims.  For instance, Wantland refused to even *confirm* Plaintiff's Eligibility and Coverages under the Policies prior to a demanded in-person recorded "interview" with Di Lillo, a member of John Timmerberg's Team (Timmerberg is Principal Investigator – Major Case Unit, Global Investigative Services, North American – SUI, and had assigned Di Lillo to "the Case" on 1 November 2016).  The totally unnecessary involvement by Timmerberg's team as only directed by claim examiners Wantland and Bichel unnecessarily delayed AIG's processing of the Claims and exposed Plaintiff's highly sensitive, personal, material non-public, personally - identifiable information to other AIG employees without the "need to know".  Plaintiff resisted meeting *in person* for this very suspicious interrogation session with Di Lillo, especially since Wantland refused in good faith to at least (from AIG's perspective) confirm his PAI/BTA Eligibility and Coverages prior to such an unnecessary meeting: these two events are completely mutually exclusive (Eligibility and Coverage are totally independent of the substantive vetting of any insurance claim, whereby it would be totally unwarranted to vet a claim if, contractually, Eligibility and Coverage are not validated beforehand).  This tenet is, of course, fully understood by Plaintiff given his details as described in BONE FIDES and he was perplexed as to how the so-

called claim experts Wantland and Bichel could be so blatantly incompetent.

It must be clear to Court that as per Plaintiff's BONE FIDES, he is an expert in the research, analysis, and adjudication of a variety of classes of claims; his eventual review of the specific AIG Policy Contracts for both PAI and BTA provided to him by AIG led him to conclude that, without doubt, he was Eligible, Covered, and in fact, owed benefits under both PAI and BTA *Quality of Life* Plans. Importantly, the policy language is conclusive that, as long as the incidents that triggered payout under the Policy Contracts occurred *during* Plaintiff's employment, there is absolutely no temporal restriction on filing good claim whatsoever. Plaintiff then took the calculated risk and subjected himself to a very difficult three hour *recorded* mandatory interrogation session with Di Lillo on 4 January 2017 at 1300 EST at Equinox Fitness Club at 45 Rockefeller Center, New York County, New York (where Plaintiff was a member at that time, under his employer Macy's, Inc. Corporate Membership). Despite the subject matter being extremely horrifying and distressing to Plaintiff – the detailing of his miseries associated with the poisonings, druggings, economic espionage, attempted murders, and illegal detentions from 2002 – 2003 – Di Lillo seemed to find Plaintiff's entirely true Statement quite humorous, and even laughed out loud at Plaintiff on several instances as he detailed the events which literally and in every way destroyed his personal, professional, and academic lives – totally and permanently.

Despite the PAI/BTA AIG Claims being obviously, irrefutably meritorious AIG – specifically Wantland and Bichel – refused to grant requisite payment in malicious, uncivil bad faith with an initial illogical, unprofessional denial letter dated 10 February 2017. Defendant Miller (another member of Bichel's Team) was then assigned to facilitate Plaintiff's Appeal to the AIG "[anonymous] *ERISA Appeal Committee*" and he then received Letter via Miller that, on 11 May 2017, the ERISA Appeal Committee denied once again recursively in bad faith his meritorious

Claims, formally communicating "...*as explained in prior letters to you, as you have exhausted the Plan's administrative remedies, you have the right to bring a civil action under ERISA 502(a)....*" which good Plaintiff does now do.

Separately, Plaintiff had escalated the bad faith allegations at AIG to defendants Naas (Senior Claims Official) and Solmssen (Global Head of Legal) on several occasions throughout the claim filing period, underlying the emergency nature of the Claims and AIG's requisite payment thereunder; both perpetuated the bad faith stance taken by their underlings Bichel, Miller, and Wantland and failed to resolve the controversy.  AIG's failure to pay in 2016 – 2017 served to exacerbate Plaintiff's permanent non-physical disabilities and financial and emotional distress and deprived him of his rightful significant liquidity under the AIG *Quality of Life* Plans via GS.

As part of the AIG Appeals process Plaintiff was granted access to his Claim File held by AIG.  The evidence substantiates purposeful violations – not only Breach of [AIG Insurance Policy] Contract – but also much more serious and damning instances of Federal wrongdoing in violation of Plaintiff's rights as naturally borne United States Citizen.  Attached as **Exhibit I** is an invaluable email chain substantiating, without doubt, these allegations in full, obtained by Plaintiff privately from AIG (Miller via email on 11 May 2017).  The first message is from Mark Telling, Senior Vice President, Frenkel Benefits, LLC (Plaintiff is uncertain as to how Frenkel is formally involved in these GS-sponsored Insurance Policies in question, as several exploratory emails from Plaintiff to Mr. Telling went unanswered) dated 23 May 2016 to Defendant Daly stating "...HI JAMES RAQUEL FROM AIG THAT IS CCED ABOVE JUST ASKED US FOR AN UPDATE ON THE SETH MITCHELL PAI AND BTA CLAIMS.  PLEASE LET US KNOW IF YOU HAVE ANY ADDITIONAL INFORMATION ON THE INFO DETAILED BELOW.  THANKS FOR YOUR HELP MARK TELLING...."

On that same day, defendant Daly replied, damningly, "....HI MARK,

APOLOGIES FOR THE DELAY, SETH MITCHELL WAS HIRED ON 7/3/2001 AND LEFT THE FIRM 11/29/2003. HE WAS ENROLLED IN PAI FROM 1/1/2003 TO 11/30/2003 WITH A $1M COVERAGE AMOUNT. HE IS NOT CURRENTLY ELIGIBLE FOR ANY BENEFITS.  SETH HAS REPEATEDLY CONTACTED GS ASKING FOR INFORMATION ON HIS CURRENT BENEFITS, OF WHICH HE HAS NONE, AND HE RECENTLY ATTEMPTED TO FILE AN LTD CLAIM. GS HAS INSTRUCTED GS HR DIRECT, AS WELL AS SOME OF OUR PROVIDERS, TO HAVE NO CONTACT WITH HIM. NO ADDITIONAL INFORMATION SHOULD BE SHARED WITH HIM CONCERNING GS BENEFITS. LET ME KNOW IF YOU HAVE ANY QUESTIONS.  THANKS, JAMES....” (Arrow #1, **Exhibit I**)

A detailed analysis of the Daly email is vital here.  First, Daly confirms employment dates for Plaintiff of 3 July 2001 – 29 November 2003.  He then confirms that in fact Plaintiff maintained PAI coverage of $US1,000,000.00 for incidents which occurred within this employment window (and via separate email confirmed that Plaintiff had paid requisite premiums under the PAI policy to Wantland).  He then, fraudulently and maliciously, goes on to state “...HE IS NOT CURRENTLY ELIGIBLE FOR ANY BENEFITS...” (Arrow #1, **Exhibit I**) in purposeful contradiction to the letter and spirit of the PAI and BTA Group Insurance Policies of which Daly did not even reference in his assertion regarding lack of eligibility and coverage.  The next written statement corroborates the violations of 29 US CODE §1132(C)(1), THE SHERMAN ANTI-TRUST ACT OF 1890 (COLLUSION, CONSPIRACY, OBSTRUCTION, ANTI-COMPETITIVE BEHAVIOUR), 15 US CODE §45, PURPOSEFUL BREACH OF CONTRACT.  Daly goes on to write “...SETH HAS REPEATEDLY CONTACTED GS ASKING FOR INFORMATION ON HIS CURRENT BENEFITS, OF WHICH HE HAS NONE, AND HE RECENTLY ATTEMPTED TO FILE AN LTD CLAIM...”  (Arrow #1, **Exhibit I**)  When Daly references Plaintiff's “attempt” to file a LTD Claim, it shows that GS was aware of Plaintiff's urgent bids to determine who the correct Insurance Carrier was for the 2003-year $180,000.00 *per annum* policy at that time, and proves that GS refused to provide such information to Plaintiff from 2004 – Present, in violation of ERISA.  Through Plaintiff's own exhaustive efforts external to GS, he spent a great deal of time, effort, and expense to File, incorrectly, a LTD Claim with The Prudential Insurance

Company of America ("Pru") on 7 May 2016, even though GS could have communicated at any time, easily and quickly, to him that the correct Carrier for the period 2001 – 2003 was in fact CIGNA.  Instead Daly, tragically, let Plaintiff spin his wheels, filing an incorrect Claim with Pru.  (*As per **Exhibit J** Plaintiff's contact at Pru, Ms. Donna Racioppi, Disability Claims Specialist, sent Letter to him dated 31 May 2016 confirming that Pru became the Group Insurance Carrier on 1 January 2005.  It then took Plaintiff until 20 December 2016 to confirm via United States Department of Labor via a phone call with employee "Manny" that CIGNA was the right firm against which to initiate good Claim.  The next day, Plaintiff initiated via phone a meritorious Class 1 Claim for benefits with CIGNA, under Claim No. 4195206, Policy No. NYK0030017, Underwriting Entity CIGNA LIFE INSURANCE COMPANY OF NEW YORK, effective date: 1 January 2000, with Policyholder The Goldman Sachs Group, Inc.*)

Daly then shows that GS engaged in illegal threats, harassment, collusion, obstruction, and conspiracy with the sole purpose to break Federal law, violate Plaintiff's rights, and place him in direct harm's way.  He goes on to write "...GS HAS INSTRUCTED GS HR DIRECT, AS WELL AS SOME OF OUR PROVIDERS, TO HAVE NO CONTACT WITH HIM. NO ADDITIONAL INFORMATION SHOULD BE SHARED WITH HIM CONCERNING GS BENEFITS...."  (Arrow #1, **Exhibit I**)  It must be clear to Court that such GS "instructions" are plainly and simply illegal, and these instructions were then communicated broadly at AIG via Batson's messaged dated 23 May 2016.  GS has engaged in such illicit machinations for several years (since 2003) whereby GS refuses to provide Plaintiff with highly valuable, necessary Benefits & Entitlements information – data that is readily available to GS and wholly unburdening to provide to Plaintiff.  (*"GS HR DIRECT" is defendant Hewitt Associates LLC ("Hewitt"), the GS third party administrator of human resources services for active and separated employees.  Plaintiff made several phone calls and electronic requests via:*

*https://leplb0020.portal.hewitt.com/web/goldmansachs/login/?tgtSite=HRWW*

*over several years to GS HR DIRECT to obtain a detail of his comprehensive Benefits & Entitlements, and was, on every occasion, read a canned, prepared sterile statement stating that neither GS nor Hewitt would provide any specific information to Plaintiff about his rightful Benefits & Entitlements, in stark violation of Federal law and Plaintiff's rights.  Plaintiff assumes Daly's statement referring to "SOME OF OUR PROVIDERS" to include CIGNA, at least.)*

Finally, on 18 November 2016, Daly sends an email to Wantland and Telling which includes a "screenshot" of a GS computer system evidencing Plaintiff's Eligibility and Coverage under the AIG PAI Group Policy in the lump-sum amount of $US1,000,000.00, (Arrow #2, **Exhibit I**) which is a fact that Wantland refused to provide to Plaintiff despite his many requests in advance of his unnecessary three hour interrogation session with Di Lillo on 4 January 2017.  (*The email chain does not reference Eligibility and Coverage and under the BTA Policy, as that Benefit was never in question at AIG.*)

Regarding her *expert* opinion on the temporal validity of a Claim Filed in 2016 for substantiated catastrophic loss which occurred in 2002 – 2003 during the Eligibility and Coverage periods, Wantland communicates internally:

"....10/31/2016 by SUSAN WANTLAND, ADD,EX, CONFERENCE/REVIEW, CONTACT AGENT,FINAL, Confidential to : Intellrisk I CALLED 212-488-0268 AND SPOKE WITH MARK TELLING OF FRENKEL, THE BROKER. I ADVISED I WANTED TO GIVE HIM THE HEADS UP WE RECEIVED A COMPLAINT FROM THE NEW YORK DEPARTMENT OF INSURANCE AND WILL BE INVESTIGATING THIS CLAIM. I AM WORKING ON SENDING AN INVESTIGATOR OUT TO INTERVIEW SETH MITCHELL IN PERSON AS IT APPEARS HE IS MAKING A CLAIM UNDER THE PAI AND GTP POLICIES. HE [Telling] ASKED IF THE CLAIMS WERE BARRED SINCE THEY WERE NOT REPORTED WITHIN 12 MONTHS AND I ADVISED WHEN THAT ISSUE HAS COME UP IN COURT THE COURTS USUALLY FIND THE CLAIM IS NOT BARRED UNLESS THERE IS PREJUDICE TO THE CARRIER, SUCH AS THE POLICE INVESTIGATION OR MEDICAL RECORDS NO LONGER BEING AVAILABLE, AND I HAVE NOT SEEN A SITUATION YET WHERE THE COURTS

HAVE DETERMINED THE CLAIM WAS BARRED. HE ASKED THE TYPE OF
CLAIM AND I ADVISED IT APPEARS HE IS CLAIMING HE HAS BEEN UNABLE
TO WORK SINCE HE LAST WORKED FOR GOLDMAN SACHS....." (*As part of his
exhaustive due diligence to uncover the significant value kept hidden from him by GS
for years, Plaintiff filed a Complaint with New York State Department of Financial
Services on 11 July 2016, assigned to Insurance Examiner Marcia Legister, Consumer
Assistance Unit; that investigation is ongoing.  Wantland uses the term "The New
York Department of Insurance" erroneously in her statement*).

　　　　Regarding the Class 1 CIGNA LTD Claim, the following is Calabria's internal
summary of her initial phone interview with Plaintiff, held on 4 January 2017:

Call Summary

1/4/17 - CM called Cx with goal of completing II call. CM spoke with Cx who advised oow 12/1/03 due to
attempted murder by poisoning while working in Hong Kong and could not work. Cx advised went out of
work in 2003, attempted to RTW in Hong Kong, but was unable to work with sickness. Cx advised was on
STD at that time unsure of who the carrier was, but was not transitioned to LTD properly. Cx advised ER
did not notify Cx of benefits Cx was eligible for. Cx advised was hospitalized against his will at Payne
Whitney Psych Clinic in June 2003 and August 2003. Cx advised was not seeing the correct Pxs as he
was treating with psych instead of physical. Cx advised tx w/ Dr. Arnold Gallo/Psych, FOV February or
March 2003. Cx advised was isolated for many years and is now working F/T starting 3/2016 to present at
Macys in retail sales. Cx advised is unable to do same job and is homeless due to low wage of current
position. Cx advised did not have any contact or tx w/ any Pxs in 2004. Cx is trying to find Px to treat for
anxiety and PTSD from event, but at this time is unable to. Cx advised speaking with 2 NPs within Cigna
for EAP program. Cx speaking with Melanie Dougherty at 888-244-6293 ext. 353704 and Sarah at 1-800-
558-8361, direct line to the nurses. Cx advised spoke with 2 social workers, Patrick Murphy 212-879-5460,
5 times and then Michael Cotayo 646-939-1997 once a week for the past 5 weeks. Cx advised is not tx w/
any providers for physical ailments. Cx advised had SSDI testing 1/7/15 by Melody Goldman/psych and
Dr. Aurelio Salon/IM. Cx advised SSDI did both psych and physical testing. Cx advised was denied due to
ER not providing earnings to SSA and Cx is not showing enough credits. Cx advised will send SSA testing
to CM and any other medical or paperwork. CM advised will outreach to ER for eligibility and will be
sending ack packet with DA for signature and return. Cx understood and call ended.

　　　　(As part of Plaintiff's CIGNA medical insurance with Macy's, Inc. (SDNY 17-
CV-1845(CM)) he was eligible for the Macy's, Inc.'s "Employee Assistance Program"
("EAP") Wellness benefit.  He was assigned bi-weekly phone consultations with
CIGNA Nurse Practitioner-Advisor "*Sarah*" in July 2016, where he discussed with
her his physical disabilities (*such as severe musculoskeletal pain associated with his*

permanently debilitating condition of hyperuricemia and exacerbated by the requirement for him to stand for 6 – 8 hours per day in his sales role at Macy's, Inc. and severe allergies exacerbated by the filthy, biologically – contaminated black land-line phones and work stations on Floor 7, Luxury Home Store, Bloomingdale's Flagship, 1000 Third Avenue, New York County, New York, 10022, his PTSD, and personality and anxiety disorders, which also were exacerbated by the inhospitable and toxic work environment/discrimination/harassment at Bloomingdale's Flagship Store (as detailed more completely in SDNY 17-CV-1845(CM)).   To assist with Plaintiff's wellness initiatives, he was assigned by "Sarah" a Social Worker the defendant Dougherty in September 2016.   During numerous phone calls with Dougherty, Plaintiff detailed the difficulties associated with his permanent, total disabilities which originated during his time of active employment at GS, and even stated that he was frustrated in his attempts to find the correct GS-related LTD Carrier to assert good claim against, and had even asked Dougherty on several phone consults to assist him with the determination if, in fact, CIGNA was the appropriate carrier for GS for 2001 – 2003.   She failed to provide such valuable answer to Plaintiff at all even though Plaintiff alleges she was purposefully withholding that information in bad faith from him.   His final phone call from Dougherty was to inform him spitefully in February 2017 that his employment with Macy's, Inc. had been [illegally] terminated and therefore his medical insurance with CIGNA was also [illegally] terminated – which only resulted in worsening Plaintiff's severe emotional distress, mental anguish, PTSD, anxiety and personality disorders.

Similar to AIG, an initial unfounded, unprofessional bad faith denial letter from Calabria was issued on 8 March 2017; Plaintiff then filed a good faith internal "Administrative Appeal" with CIGNA, which was also met with unfair, unjust, illegal denial via letter dated 5 May 2017.   Similar to the process at AIG, Plaintiff at that stage was granted access to his "entire" CIGNA Claim File.   This detail produced additional damning evidence against GS.   In an email dated 17 January

2017, defendant O'Neill at GS responds to Calabria's request for Plaintiff's Eligibility and Coverage information under the GS Class 1 Quality of Life Plan "...HI LEAH, CAN YOU GO BACK TO SETH AND SAY 'AS PREVIOUSLY COMMUNICATED BY GS, YOU ARE NOT ELIGIBLE FOR THE LTD BENEFIT'. ALSO, PLEASE DO NOT SHARE OUR NAMES IF HE ESCALATES..."  O'Neill, like Daly with AIG, does not reference the underlying CIGNA Policy Contract in her communiqué, which would form the *only* legal basis for decisions on Eligibility and Coverage.   Instead, she makes a fraudulent statement – a collusive conspiratorial anti-competitive command – to CIGNA to illegally deny benefits to him, and, knowing full well that she is engaging in purposeful Federal wrongdoing, orders Calabria to ensure that she remains anonymous if "escalation" occurs via Plaintiff directive.

**4.      THE AIG PAI POLICY: CLASS 1 EMPLOYMENT STATUS (BAD FAITH, BREACH OF CONTRACT)**

Policy No. 8058346 for Policyholder: Goldman, Sachs & Co. is the relevant Contract under which Plaintiff is Eligible and Covered.   The salient topics that substantiate Plaintiff's Claim for compensation are as follows:

"**Insured** means a person: (1) who is a member of an eligible class of persons as described in the Classification of Eligible Persons section of the Master Application; (2) who has enrolled for coverage under this Policy, if required; (3) for whom premium has been paid; and (4) while covered under this Policy.

**Injury** - means bodily Injury caused by an accident occurring while this Policy is in force as to the person whose injury is the basis of claim and resulting directly and independently of any other causes in a covered loss.

**Effective Date**. An Insured's coverage under this Policy begins on the latest of (1) the Policy Effective Date; (2) the date the first premium for the Insured's coverage is paid in accordance with the Premiums section of the Master Application; (3) if Individual enrollment Is required, the date written enrollment is received by the Policyholder; (4) the date the person becomes a member of an eligible class of persons as described in the Classification of Eligible Persons section of the Master Application; or (5) the Coverage Effective Date described in the Master Application.

**Termination Date**. An Insured's coverage under this Policy ends on the earliest of: (1) the date this Policy Is terminated; (2) the premium due date If premiums are not paid when due; (3) the date the Insured requests, in writing, that his coverage be terminated; or (4) the date the Insured ceases to be a member of any eligible class(es) of persons as described in the Classification of Eligible Persons section of the Master Application.

**Termination of coverage will not affect a claim for a covered loss that occurred while the Insured's coverage was in force under this Policy.**

**Permanent Total Disability [PTD] Benefit** (Single Payment): If, as a result of an Injury, the insured or an Insured Spouse is rendered Permanently Totally Disabled within 365 days of the accident that caused the Injury, the Company will pay 100% of the Principal Sum at the end of 12 consecutive months of such Permanent Total Disability.  Permanently Totally Disabled/Permanent Total Disability as used in this Rider, means that the Insured or an Insured Spouse is permanently unable to perform the material and substantial duties of any occupation for which he or she is qualified by reason of education, experience or training.

The facts are conclusive that during the period 2002 – 2003 Plaintiff suffered several near life-ending global incidents of drugging, poisoning, attempted murder, and illegal incarceration which has rendered him PTD'd ever since. Regardless, the facts show that had GS acted in good faith and facilitated the Filing of the AIG PAI Claim in November 2003 at time of accrual, he would have been paid the full **$US1,000,000.00** benefit in November 2004 based on the Contract. As such, it is reasonable for Plaintiff to request that accrued and unpaid interest also be paid on this Claim as of 30 December 2004.

5.      **THE AIG BTA POLICY: CLASS 1 EMPLOYMENT STATUS (BAD FAITH, BREACH OF CONTRACT)**

Policy No. 8058345 for Policyholder: Goldman, Sachs & Co. is the relevant Contract under which Plaintiff is Eligible and Covered.  The salient topics that substantiate Plaintiff's Claim for compensation are the same as per the PAI Policy, except for the following *addition*:

**Felonious Assault Benefit:** The Company will pay a benefit under this Rider

when the Insured suffers one or more losses for which benefits are payable under the [Permanent Total Disability Benefit] provided by the Policy as a result of the Felonious Assault that is directed at the Policyholder, his property or assets, or the *Insured* while he or she is acting on behalf of the Policyholder as a member or representative. Felonious Assault means any willful or unlawful use of force upon the Insured Person: (1) with the intent to cause bodily injury to the Insured Person: and (2) that results in bodily harm to the Insured; and (3) that is a felony or a misdemeanor in that Jurisdiction in which it occurs.

**Limit of Liability**: Limited to an aggregate of $50,000,000.00 per accident.

Plaintiff experienced several Felonious Assaults as contractually - defined in Tokyo, Bangkok, Hong Kong and New York County, New York in 2002 – 2003. Regardless, the facts show that had GS acted in good faith and facilitated the Filing of the AIG BTA Claim in November 2003 at time of accrual, he would have been paid the full **$US500,000.00** benefit in November 2004 based on the Contract. As such, it is reasonable for Plaintiff to request that accrued and unpaid interest also be paid on this Claim as of 30 December 2004.

## 6.    THE CIGNA LTD POLICY: CLASS 1 EMPLOYMENT STATUS (BAD FAITH, BREACH OF CONTRACT)

Policy No. NYK-030017 for Policyholder: The Goldman Sachs Group, Inc. is the relevant Contract under which Plaintiff is Eligible and Covered. The salient topics that substantiate Plaintiff's Claim for breach of compensation are as follows:

**Class 1 Employee:** All active, Full-time U.S. Employees of the Employer, classified as Vice President, Manager, Assistant Manager, Salesperson, Trader, Investment Banker or Managing Director, working a minimum of 20 hours per week.

**Definition of Disability/Disabled:** An Employee will be considered Disabled if, because of Injury or Sickness, he is unable to perform all the material duties of his regular occupation, or solely due to Injury or Sickness, is unable to earn more than 80% of his [total compensation].

**Notice of Claim**: [NOTICE] MUST BE GIVEN TO THE INSURANCE COMPANY AFTER A COVERED LOSS OCCURS OR BEGINS OR AS SOON AS REASONABLY

POSSIBLE. IF THIS NOTICE IS NOT GIVEN WITHIN A REASONABLE AMOUNT OF TIME, THE CLAIM WILL NOT BE INVALIDATED OR REDUCED IF IT IS SHOWN THAT SUCH NOTICE WAS GIVEN AS SOON AS WAS REASONABLY POSSIBLE.

**Insurance Data:** The Employer agrees to use reasonable efforts to cooperate with the Insurance Company in the review of claims and applications.

**Rehabilitation During A Period of Disability**: The employee may participate in a Rehabilitation Plan, a written agreement between the Employee and the Insurance Company in which the Insurance Company agrees to provide, arrange, or authorize vocational or physical rehabilitation services. The Rehabilitation Plan may, at the Insurance Company's reasonable discretion and to the extent agreed in advance with the Employee, allow for payment of the Employee's medical expense, education expense, moving expense, accommodation expense, or family care expense while he participates in the Rehabilitation Plan.

**Injury**: Any bodily harm, including all related conditions and recurring symptoms of the injuries, that results directly or indirectly from an Accident.

**Sickness**: Means physical or mental illness.

Even more conclusive than the Claims against the AIG defendants are the Claims against the CIGNA defendants. It is a factual certainty that Plaintiff was severely Injured and made Sick in 2002 – 2003 to the extent he was PTD'd in 2003, and had been on leave intermittently throughout 2003 from his daily work in Hong Kong with the full knowledge of, and support by, senior management at GS. Regardless, the facts show that had GS acted in good faith and facilitated the Filing of the CIGNA LTD Claim in November 2003 at time of accrual, he would have been paid the full **$US15,000.00 per month** benefit beginning in November 2004, based on the Contract. As such, it is reasonable for Plaintiff to request that accrued and unpaid interest also be paid on this Claim as of 30 November 2004.

It also goes without stating that GS has purposefully and in bad faith breached the Insurance Data provision of the Contract, and must be held

accountable for such long-term recursive violations.

7.      **STARK BAD FAITH AT GS, CIGNA, AIG, AND CITY OF NEW YORK**

State of New York has solidified clearly its stance on Bad Faith Claims: AIG and CIGNA are regulated via New York Insurance Law §2601: Unfair Claims Settlement Practices and, by extension, New York General Obligations Law §349. Voluminous common law precedent exists via: *Best Bldg. Co., Inc. v. Employers' Liab. Assurance Corp.*, 247 N.Y. 451 (1928), *Gordon v. Nationwide Mut. Ins. Co.*, 30 N.Y.2d 427 (1972), *Pavia v. State Farm Mut. Auto. Ins. Co.*, 82 N.Y.2d 445 (1993), *New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308 (1995), *Bi-Economy Mkt., Inc. v. Harleysville Ins. Co. of New York*, 10 N.Y.3d 187 (2008).

Plaintiff has provided both AIG and CIGNA with the voluminous factual, evidentiary support required to approve and pay the Quality of Life Insurance Plans of PAI, BTA, and LTD, including but not limited to requisite HIPAA releases. Regardless, both companies maintain substantial financial and human capital resources, expertise, and marketplace relationships to obtain independently any additional corroborating details required to validate the Claims and make prompt, necessary payment and provide good Claimant / Plaintiff with the support he most certainly deserves throughout the disabling period of 2003 – Present.

Yet, in concert with the most hateful, spiteful, malicious, and vindictive GS, they continue to act in Bad Faith, depriving Plaintiff of the Quality of Life liquidity that is owed to him since 2003 as sole Eligible and Insured under these three policies – and desperately need – as an indigent, destitute, long-term homeless person.

NYPD and FDNY employees, during the TRUMP and Irving incidents, have proven themselves to have acted criminally, the result of which are the host of permanent disabilities Plaintiff maintains today: PTSD, anxiety and personality disorders, and Plaintiff's numerous private requests for settlement with City of New York have gone unanswered in full.

**8.    VIOLATIONS OF 42 US CODE §1983, OBSTRUCTION OF JUSTICE BY THE CITY OF NEW YORK (NYPD & FDNY)**

Plaintiff is claiming purposeful deprivation of his rights by The City of New York for the permanent total disabilities of PTSD, anxiety and personality disorders which resulted from the substantiated illegal actions which occurred during and subsequent to the TRUMP and Irving incidents, where such illegal actions destroyed each and every aspect of Plaintiff's personal, professional, and academic lives since and have resulted in his destitution, impoverishment, and long-term homelessness through today.

On 25 July 2017 Plaintiff received an email reply from Mazur to his many written and oral requests for private, formal, *complete and unredacted* discovery in good faith regarding NYPD unlawful involvement in the TRUMP and Irving incidents and details of any related fraudulent 911 call reports (recordings, transcripts, etc.), instead stating erroneously that such records had already been illegally destroyed by NYPD and therefore would not be made available to him.

On 9 August 2017 Plaintiff received an email reply from Sonpon to his many written and oral requests for private, formal, *complete and unredacted* discovery in good faith regarding FDNY unlawful involvement in the TRUMP and Irving incidents and details of any related fraudulent 911 call reports (recordings, transcripts, etc.), instead stating in bad faith that such records would not be made available to him.

Plaintiff communicated to both Mazur and Sonpon that such blatant cover-ups designed solely to frustrate the Plaintiff's pursuit of his meritorious Federal Claims would not be tolerated, and that their failure to work privately and consensually with him would be duly noted to Court.  Such complete unredacted information is not only relevant to the efficient pursuit of these historical §1983 Claims, but also is relevant to Plaintiff's determination that such fraudulent 911 calls and the other illegal actions detailed in this Complaint never adversely affect

him again in the future.  The Court must consider this substantiated obstruction of justice by The City of New York as nourishment to Plaintiff's Claims asserted herewith in good faith.

9.   **DOCTRINE OF CONTINUING VIOLATION (TOLLING OF ANY RELEVANT STATUTE OF LIMITATIONS), CONTINUING DEFAMATION *PER SE***

Plaintiff maintained a formal professional relationship with The Goldman Sachs Group, Inc. through March 2013 when his Goldman Sachs Private Wealth Management {Investment} account was closed.  This formal professional multi-faceted relationship began on 3 July 2003 in the context of Plaintiff's employment with GSSG.  As the salient facts come together in the preparation of this United States Sovereign Complaint, it is now clear that unbeknownst to Plaintiff, GS has engaged in a purposeful *Campaign* of defamation *per se* against him, continuously from 2003 – Present, where such *Campaign* continues to cause him permanent personal, professional, and academic damage.

The specific, published terms applied illegally to good Plaintiff (**EXHIBITS B, E**) in 2003 are: "DEPRESSED, EMOTIONAL, VIOLENT, FIGHTING, GOING CRAZY" at least, and these outrageously defamatory statements made via the 2003 fraudulent 911 call reports have continued to negatively affect each and every aspect of Plaintiff's personal, professional, and academic lives, ever since.

In February 2011 for the first time since 2003 he began gainful employment in financial services with Cantor Fitzgerald, L.P. ("Cantor") in New York County, New York, and was illegally separated in March 2013 due to the GS-sponsored Campaign of defamation *per se* which reached Cantor.  (See *Mitchell v. Cantor Fitzgerald, L.P., et al.*, New York County Index No. 108597/2011, **$US13,000,000.00 Default Claims**, *uncured*).

In September 2011, he matriculated to New York University ("NYU") in New York County, New York, as an adult returnee to academia, in a Master of Science Program in Management & Systems and Human Resources Management.  Even

though he was an upstanding member of the NYU community with a distinction level GPA of 3.74/4.00, he was illegally separated from NYU in October 2012 in the middle of the semester, unable to complete the degree or transfer the credits to another institution of higher learning, based on the GS-Sponsored Campaign of defamation *per se* which reached NYU.  (See *Mitchell v. New York University, et al.*, New York County Index No. 150622/2013, **$US49,000,000.00 Default Claims**, *uncured*).

In March 2015, he began gainful employment with Macy's, Inc. in New York County, New York, and was illegally separated in February 2017 due to the GS-Sponsored Campaign of defamation *per se* which reached Macy's, Inc.   (See Mitchell v. Macy's, Inc., et al. SDNY Index No.

In July 2017, good Plaintiff had his formal Offer of employment with Bank of America Merrill Lynch Wealth Management (issued in June 2017) revoked in stark bad faith due to erroneous, fraudulent, anti-competitive complaints lodged against him by GS, as further detailed in SDNY 17-CV-1985(CM).

It is a factual certainty that GS has purposefully caused with malicious intent Plaintiff's illegal employment separations at Cantor Fitzgerald, L.P. (March 2011), Macy's, Inc. (February 2017), and Bank of America Merrill Lynch (July 2017) and the illegal academic separation at New York University (October 2012); each and every attempt Plaintiff makes to advance himself since 2003 has been thwarted by GS, validating the Doctrine of Continuing Violation and therefore tolling any statute of limitations from the period November 2003 – Present.

10. **PLAINTIFF'S DEALINGS WITH UNITED STATES DEPARTMENT OF LABOR – EMPLOYEE BENEFITS SECURITY ADMINISTRATION ("DOL-EBSA")**

On 11 July 2016 Plaintiff initiated a Case against GS with DOL-EBSA via phone and email with Mr. Giacomo Turrini, Benefits Advisor.  On 25 July 2016 Mr. Turrini referred Plaintiff to New York State Department of Financial Services for

his Complaint against GS.  On 5 January 2017 he spoke with another DOL-EBSA Benefits Advisor, Mr. Christian Bauer, after receiving a voicemail a few days earlier from Mr. Bauer, who stated that "some guy, a lawyer, named Steve/Steven/Stephen" was somehow directly [inappropriately] involved in the controversy surrounding Plaintiff's accrued and unpaid GS Benefits & Entitlements, and intimated to Plaintiff that "Steve/Steven/Stephen" might have somehow illegally absconded with Plaintiff's value under his GS Benefits & Entitlements.  When Plaintiff pressed Mr. Bauer, he refused to elaborate.

On 10 February 2017 Plaintiff received an email from Mr. Bauer that evidenced an earlier email he received from GS, where GS confirmed that Plaintiff was, without doubt, Eligible and Covered under the CIGNA LTD and AIG PAI and BTA Plans.  On 31 May 2017 Plaintiff spoke with DOL-EBSA Supervisor Ms. Christina Rim in response to Ms. Rim's voicemail to him a few days earlier.  Ms. Rim stated she would work to resolve the controversy and had requested additional confirmatory details from him, which he sent to her via email that same day.  On 28 July 2017 Plaintiff sent an email to Ms. Rim stating that the controversy remained unresolved, and that as he had "exhausted his administrative remedies" at both CIGNA and AIG, he was then compelled to File Suit in Court.


III.    INJURIES SUSTAINED

As proven factually in this Complaint, Plaintiff has been indelibly, irreparably, and purposefully harmed and damaged by the named and doe defendants in this matter (with The City of New York determined to prevent Court and Plaintiff from ascertaining the names of certain relevant *doe* defendants): physically, non-physically, and economically, where such severe financial and emotional distress, intense mental anguish, extreme PTSD and personality and anxiety disorders, at least, continue unabated from January 2003 to this very day. GS is the particularly very bad actor, here purposefully failing to provide good Plaintiff with the requisite details of his full suite of employment – based Benefits

& Entitlements since 2004, maliciously, vindictively, spitefully and cruelly, spewing repeatedly illegal directives to Hewitt, AIG, CIGNA, Cantor Fitzgerald, L.P., Macy's, Inc., Bank of America Merrill Lynch, New York University which has resulted directly in the unconscionable delays in his filing of rightful Claims, and then in the illegal denials of those claims once Filed.

Given that GS has purposefully derailed Plaintiff's seamless transition from short-term disability in 2003 to CIGNA's long-term disability Quality of Life Plan, and denied him access to the AIG Quality of Life Plans at that time as well, and has since denied him the rightful information for these CIGNA and AIG Plans until it was distributed to him by CIGNA and AIG once good claims were filed in 2016, it is Plaintiff's contention that such illegal actions by GS should result in front pay to Plaintiff from 2004 – Present.

## IV.      CREDIT QUALITY OF DEFENDANTS & RELIEF REQUESTED

In layman's terms, credit quality is defined as *"a debtor's ability and willingness to repay debts"*.  In the adjudication of any litigation claims, Court must take into consideration the credit quality of the defendants when money damages are demanded to ensure that the Plaintiff's efforts are not frivolous and the Court's time not wasted.  Here, the main foundational entity defendants GS, AIG, and CIGNA maintain substantial financial capital to pay good Plaintiff's Claims easily and without undue burden – they have the ability to pay effortlessly – but not the civil willingness to pay.

As of 30 June 2017, GS maintains $US111 Billion of Cash on its balance sheet (GS Form 10-Q for the Quarter ended 30 June 2017), AIG maintains $2.5 Billion (AIG Form 10-Q for the Quarter ended 30 June 2017), and CIGNA maintains $US3.6 Billion (CIGNA Form 10-Q for the Quarter ended 30 June 2017).

Of the CIGNA defendants, Plaintiff Demands compensatory damages in the form of performance under the Class 1 Quality of Life Plan based on the following

calculation:  ($US15,000.00 per month principal payment) x (163 month accrual period) = **$US2,445,000.00 Face Claim** + 9.0% New York State Default Interest compounded semi-annually from January 2004 – Present.

Of the AIG defenandants, Plaintiff Demands compensatory damages in the form of performance under the Class I Quality of Life Plans, with a $US1,000,000.00 Lump Sum Payment for the PAI Plan and a $US500,000.00 Lump Sum Payment for the BTA Plan, for a **$US1,500,000.00 Face Claim** + 9.0% New York State Default Interest compounded semi-annually from September 2004 – Present.

Of the GS defendants, Plaintiff Demands compensatory damages in the form of 29 US CODE §1132(C)(1) penalties calculated as: ($US100/day) x (4,971 days) = $US497,100 for the period 1 January 2004 – Present, and a *front pay* penalty calculated as: ($US675,000.00 final [2003] year's total compensation) X (13 years) = $US8,775,000, where the total compensatory damage Demand stands at **$US9,272,100.00**.

Of The City of New York defendants, Plaintiff Demands compensatory damages of $US1,000,000.00 *per annum* from the period 2004 – Present, for a total of **$US13,500,000.00**.

Of all the defendants, good Plaintiff – Prosecutor hereby demands in good faith punitive damages in the sum total of **$US150,000,000.00** (where 25% of such monies collected will be allocated by Plaintiff to a standalone Fund to assist United States citizens in the pursuit and resolution of meritorious State or Federal litigation claims accrued in the context of employment and/or bad faith insurance controversies) and asserts such Claim against their assets;

For a total Demand of **$US26,717,100.00** in compensatory and **$US150,000,000.00** in punitive damages asserted against the defendants' assets (before relevant New York State Default Interest of 9.0% and any other costs, fees and expenses and relief the Court finds just to award) for a total demand of

**$US176,717,100.00** (*One Hundred Seventy Six Million, Seven Hundred Seventeen Thousand, and One Hundred United States Dollars and Zero Cents*).

## V.      PLAINTIFF – PROSECUTOR'S CERTIFICATION

Good Plaintiff – Prosecutor, self-represented and destitute, impoverished, and long-term homeless due to the purposeful damages inflicted repeatedly by the defendants *en masse* from the period 2003 - Present, certifies to the best of his knowledge, information, and belief that The:

1. United States of America Sovereign Complaint is not being presented for an improper purpose (*such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation*);
2. Litigation Claims are supported by existing law or by a non-frivolous argument to change existing law;
3. Factual contentions have baseline evidentiary support or will most certainly have full evidentiary support after a reasonable opportunity for further investigation or via formal Discovery Court-sanctioned processes; and
4. Complaint otherwise complies reasonably with the requirements of Federal Rule of Civil Procedure 11.

**WHEREBY** Plaintiff-Prosecutor now does request that Her Honour The Chief United States District Judge for the Southern District of New York dispatch immediately United States Marshals Service to Summon *personally* all the nefarious defendants to Court to Answer for their Crimes against him.

Dated:          This the 17th day of August in the year 2017
                    New York County, New York

Duly Executed:

Seth Mitchell, Plaintiff–Prosecutor & Sole Claimant,
208 East 51st Street, Suite 391, New York County, New York, 10022
Direct: 1.646.801.2045
Email: seth.mitchell@ashemllc.co



*Temp*

Important –
please sign
and return by
5 July 2001

EXHIBIT A

## Memo

| | |
|---|---|
| **To** | Seth Kosik |
| **CC** | Mark McGoldrick |
| | Joseph Henchey |
| | Josephine Leung |
| | Steve Williams |
| | Diane Sinti |
| | Nancy Reiss |
| | Frederick Leong |
| | Nashara Alberico |
| | Rachel Hedbavny |
| | Peggy Tang |
| | Fergus Tong (E&Y Hong Kong) |
| | FILE |
| **From** | Caroline Tsui |
| **Date** | 28 June 2001 |

| **Subject** | **International Staff Program Benefits – Hong Kong** | **Page** | **1 of 5** |
|---|---|---|---|

This memorandum summarizes your current benefits as a participant in the International Staff Program in Hong Kong

Your International Staff Program benefits have been determined on the assumptions that you are single, that your home country is the United States, that you will receive the International Staff Program benefits for an Executive Director, and that your start date in Hong Kong will be 3 July 2001  If any of these personal assumptions are incorrect, please let me know.  The description of benefits below also assumes that your employment with the firm and this assignment will continue for a period of at least 18 months, although these factors are, of course, subject to the discretion of the firm.

Please note that your International Staff Program benefits, including those described below, are subject to change, the firm may elect to modify and/or discontinue the International Staff Program in whole or in part at its discretion without notice.  The application of International Staff Program policies, including the determination and calculation of any amounts payable under the program, shall be made at the discretion of the firm  In particular, the figures quoted are based on allowance tables and housing benefit currently in force for Hong Kong and may change over the length of your assignment.

To be eligible to participate in the International Staff Program, and, specifically, to receive any of the benefits of the program, you must complete and return to us this assignment memorandum and the



**Human Resources**
Hong Kong

**Important –
please sign
and return by
5 July 2001**

# Memo

enclosed copy of the International Staff Program Agreement regarding Tax Equalization. A copy of this memorandum and the agreement has been included for your files.

### Work Permit & Registration
It will be necessary for you to obtain a Hong Kong work visa. Please contact Portia Chan in Hong Kong at 2978-1960 as soon as possible to arrange a visa takeover from your previous employer.

In addition, persons holding sales, trading, investment banking and research positions must obtain registration with the Securities and Futures Commission (SFC) in Hong Kong. Please contact Mary Sung at 2978-0093 to discuss registration and obtain the necessary forms.

### Cost-of-Living Allowance
Your cost-of-living allowance ("COLA") will be US$3,439 per month. The COLA is an after-tax payment to you (i.e., the firm will pay all taxes associated with providing this allowance to you), which will be reviewed periodically and adjusted either up or down, at the firm's discretion for changes in foreign exchange rates and other factors.

### Housing
The firm will hold the lease on your apartment in Hong Kong and, within the firm housing benefit, pay the full rent on that apartment. The current housing benefit for your firm-held lease is HK$59,749 per month The housing benefit is determined by your level within the firm and a family size of one. If you select an apartment above this housing benefit, you will be responsible for the excess rent on a monthly basis and any additional realtor's commission and security deposits. However, as an incentive for you to reduce the firm's cost and in order to provide you with a greater flexibility on where you choose to live, the firm will make available a housing rebate if your rent is lower than the housing benefit. This rebate will be equal to 50% of the difference between your rent and the housing benefit, and will be subject to hypothetical tax

**The net housing benefit will be reviewed periodically and can go down as well as up and once revised may go into effect immediately. Please exercise caution when taking on a new lease. Live within your means and do not enter into a lease, which you cannot afford in the event of changing conditions.**

The Firm does not recommend the purchase of real estate while on assignment in Hong Kong. However, should you purchase a home in Hong Kong, or if you have purchased such a property, the Firm will pay a net cash housing allowance to you, which is equal to 100% of net housing benefit as

**Important –
please sign
and return by
5 July 2001**

# Memo

determined for rental accommodations.  If you elect this option, you will need to sign an indemnity agreement.  Please contact me for further details

## Utilities
To further provide you with flexibility in dealing with your own rental situation, we will provide you with a monthly cash allowance for payment of your utilities.  This allowance is equal to 3 5% of your housing benefit or rent, whichever is less.

The firm will also pay management fees, government rates and air conditioning contracts up to 10% of the lesser of your actual rent or your housing benefit.

## Home Leave
Under the new policy, you are given a choice between one of the following for your home leave benefit

### Option 1 – Ticket
One round-trip business class ticket each to your country of tax equalization (U.S.) for you and the family members who are with you in your assignment location. Please get approval from the Human Resources Department prior to issuance of your tickets through firm-approved travel agents  PLEASE NOTE: You should elect the cash option if you want flexibility in terms of class of travel or stopovers.

### Option 2 – Cash
A cash allowance equal to 75% of the cost of one full fare round-trip business class ticket each to your country of tax equalization (U S) for you and the family members who are with you in your assignment location  The firm will determine the value of the cash allowance

The election form is attached for your action.

## Tax Equalization and Tax Preparation Assistance
In general, under the firm's Tax Equalization Program, your income tax liability on foreign sourced wages paid to you by the firm will be limited to that of a hypothetical U.S. employee  Actual U S and Hong Kong income tax liabilities on that income will be reimbursed by the firm. Your tax rate during the 2001 tax year will be based on your estimated international earnings during that calendar year  A year-end adjustment will be made to your U S  hypothetical tax rate based on actual 2001 firmwide earnings. In addition, your tax rates may be modified at any time to reflect any changes introduced in the U S. tax code or for any other reason that the firm deems appropriate   Full details concerning the firm's Tax Equalization Program are available from Joe Henchey on (212) 902-4139 in the Tax Department.

**Important –
please sign
and return by
5 July 2001**

## Memo

The firm will pay the reasonable and customary costs for Ernst and Young to prepare and file your U.S. and Hong Kong tax returns.  Please contact Fergus Tong at Ernst & Young on 2629-3657 to schedule a meeting in order to discuss these matters

### Free LookBack Policy
The International Staff Program contains a "free lookback" provision. A free lookback is a comparison of your net compensation on the ISP (compensation less hypothetical taxes, plus ISP allowances) and the notional net compensation that you would have been paid if you had been employed on local terms (compensation less actual taxes, ignoring allowances).

The calculation will be prepared after the end of the firm's fiscal year in respect of that year  For the purpose of calculating the free lookback, any Goldman Sachs Restricted Stock delivered to you and any Restricted Stock Options over Goldman Sachs stock that you have exercised, during the relevant fiscal year, will be treated as additional compensation, to the extent the income is subject to hypothetical tax.

The free lookback calculation MAY result in an additional cash payment, to be made on an after-tax basis to you, in the event your estimated net compensation on ISP is less than your estimated net compensation as a local employee. The local calculation will take into account your actual fact pattern, including estimated workday information, contributions to retirement or pension plans that you actually made, and the value of certain benefits available to local employees. In the event you receive a free lookback payment for a given year, you will remain on the ISP for the following year, subject to the normal transition schedule

### Banking/Payroll
You will be paid once a month, on the last Friday of every month, in US$ by Goldman Sachs (Asia) LLC. Funds paid by Goldman Sachs (Asia) LLC can be deposited into <u>any</u> dollar-denominated bank account You will need to complete a form to advise Fred Leong (212) 357-9954 in the Payroll Department in New York of details such as the full name of the bank, the address of the branch where you would like your funds deposited, the Swift/Sort code of the bank and your account number as soon as your account is established  You may either have all of your pay deposited into this account or, alternatively, you may have part of your funds paid to a dollar-denominated bank account outside of the US and the remainder to a US bank account  If you prefer the latter, you will need to further advise Fred of the dollar amount you wish to have deposited monthly into your bank account outside of the US (to the nearest hundred US dollars).  Should the overseas bank charge you a monthly transfer fee for depositing your pay, an amount up to US$15 per month will be reimbursed to you via payroll  If you do not have a direct deposit account in the US but wish to establish such an account, you should, again, contact Fred who will

**Important –**
**please sign**
**and return by**
**5 July 2001**

## Memo

provide you with necessary information for doing so. If no banking details are supplied, a physical check will be issued and sent to you in the inter-office mail.

**Health & Retirement Benefits**
During your assignment in Hong Kong you will be covered under the U.S. Health Care Program as well as the U.S. Retirement Plan (including life and disability coverage). Please contact Josephine Leung at 2978-0303 in the HK office to discuss the details of your health or retirement benefits. Please note that while the firm intends to continue these plans, it reserves the right to modify and/or discontinue any of its benefit programs.

**Transition**
Under the current policy, participation in the International Staff Program in Hong Kong is limited to a combined maximum of 4 years. If the combined duration of your Hong Kong assignment should exceed 4 years, under the current policy you will transition off allowances over a period of 3 years while retaining full education, home leave and tax preparation assistance and receiving 80%/50%/20% of the difference between the value of ISP and the Local Program. You will be responsible for your actual tax liability from the date of the transition period. At the end of the 3-year transition period, you will also be responsible for your education and home leave expenses and you will be asked to contribute toward the cost of tax preparation.

Alternatively, you have the option to forfeit your ISP benefits and assume local status.

If you have any questions, please call me on 2978-1667

**Acknowledgment**

I have read and understand the foregoing.

_____                    28-Jun-01
**Employee Signature (Seth Kosik)**                        **Date**

**Please return your signed memorandum to Caroline Tsui in Hong Kong Human Resources, 58/F Cheung Kong Center.**

**Goldman, Sachs & Co.**
**Employees' Profit Sharing Retirement Income Plan**

**Rollover Contributions**

**To:    The Retirement Committee**

I hereby request acceptance into the Goldman, Sachs & Co. Employees' Profit Sharing Retirement Income Plan (the "Profit Sharing Plan") of my rollover contribution from the:

Natwest Group Savings & Investment Plan (name of qualified plan).

I understand that this rollover <u>may not</u> consist of after-tax contributions made to another qualified plan, amounts held in an individual retirement account (unless the entire account is attributable to contributions, other than after-tax contributions, made to another qualified plan), or contributions made to an arrangement described in Section 403(b) or Section 457 of the Internal Revenue Code, and must be done within 60 days of receipt of the check from my previous qualified plan trust account.

I further understand that these monies will be invested in accordance with my most recent New Contributions investment election and that these monies <u>cannot</u> be withdrawn from the Profit Sharing Plan until my termination or retirement from the firm.

SETH KOSIK
**Participant's Name (Please Print)**

*Seth Kosik*
**Participant's Signature**

**Social Security Number**

HONG KONG
**Work Location**

XO711
**Work Extension**

23-July-01
**Date**

45944

CW 8/21

AUG 13 2001

Initial type: EDP        Final type:EDP        --- PSYCHIATRIC PATIENT
CRO:#8670 (CR10)  Disp:#0874 (MN3D)  Held ?:NO  Relay:  Segment: 7  Area:M4  Atom: 020A
Location: CENTRAL PR W/COLUMBUS CR ,MN

EXHIBIT B

| Time | Event | Detail |
|------|-------|--------|
| 11:34:15 | PDCOMP | (T64) VIOLENT --IN THE TRUMP INTERNATIONAL --HOTEL--RM---724--FLR----7--- OPR 2109-CP64+ (8670) |
| 11:34:46 | SUPPLEMENT-PD | (T64) ML IS FIGHTING----AT THE LOC W THE---FAMILY-------+ (8670) |
| 11:34:46 | CHANGED-PDPHONE | (T64) ████████████   ██████████  (8670) |
| 11:36:32 | ENTRY | (8670) CSP//M//██//PT PHYC HX/ASP CLR GOING CRAZY IN HOTEL RM///// NFI////// PT INSIDE HOTEL////RM 724 |
| 11:36:37 | FINAL | (8670)ACK SENT TO PD |
| 11:37:07 | PDEMS | (T64) ------------THE LOC---WAS--PUT IN W CROSS STREETS---BECAUSE THE TRUMP INTERNATIONAL HOTEL---GIVES A CROSS OF MADISON AVE------- THE ML STS THE LOC--AS COLUMBUS CIR N CPW----+ |
| 11:37:18 | SUPPLEMENT-PD | (T64) --SPCT----CROOKS NTFD+ |
| 11:37:42 | SUPPLEMENT-PD | (D06A) 020A ASSIGNED+ |
| 11:41:00 | SUGG-UNITS1 | (0874) >10D2 %10O2  Dual >11G2 %10E2 ~08A2 |
| 11:41:00 | SUGG-UNITS2 | (0874) >11X2 %08W2  Dual %11W2 %10W2 %10Y2 |
| 11:41:00 | SUGG-UNITS3 | (0874) >11X2 %08W2 >10D2 %10O2  Dual >11G2 |
| 11:41:00 | ASSIGNED | (0874) 10D2 #8404 SCHULZ EMT-B, DOUGLAS HN:14 #7629 SIMONESCHI EMT-B, ANDREW HN:14 |
| 11:41:01 | ETA-88 | (0874) 10D2=114700 019A 020A |
| 11:41:45 | * DMSG-RECEIVED | (8404) 10D2 |
| 11:42:00 | * ENROUTE | (8404) 10D2 |
| 11:44:21 | SUPPLEMENT-PD | (D06A) 020A 84  + |
| 11:47:22 | SUPPLEMENT-PD | (D41A) 000ESA2 ASSIGNED+ |
| 11:49:56 | SUGG-UNITS1 | (0809) %10O2  Dual ~11G2 %08A2 %10E2 |
| 11:49:56 | SUGG-UNITS2 | (0809) >11X2 >08W2  Dual %11W2 %10W2 %10Y2 |
| 11:49:56 | SUGG-UNITS3 | (0809) >11X2 %08W2 %10O2  Dual ~11G2 %10W2 |
| 11:49:56 | ASSIST/ENROUTE | (0809) C112 #0422 MANN LT.BATT-19,BRADLEY @ CENTRAL PR W/COLUMBUS CR ,MN |
| 11:49:56 | ETA-88 | (0809) C112=120156 026B 020A |
| 11:50:05 | * DMSG-RECEIVED | (0422) C112 |
| 11:51:56 | * ONSCENE | (0422) C112 |
| 11:53:22 | CONTACT | (0874) 10D2 , NR FOR ETA |
| 11:53:30 | * ONSCENE | (8404) 10D2 |
| 12:00:38 | SUGG-UNITS1 | (0874) >10O2 >10C2  Dual >08A2 %10E2 |
| 12:00:38 | SUGG-UNITS2 | (0874) ~11Y2 %11X2 ~07X2 %08W2  Dual %10W2 |
| 12:00:38 | SUGG-UNITS3 | (0874) ~11Y2 %11X2 ~07X2 %08W2 >10O2 >10C2 |
| 12:00:38 | ASSISTED/RADIO | (0874) 11Y2 #9528 LANGLEY MEDIC, JOHN HN:11 #7246 FIELDS MEDIC, BRETT HN:11 @ CENTRAL PR W/COLUMBUS CR ,MN , 2ND PT CARD |
| 12:00:38 | ETA-88 | (0874) 11Y2=120338 018M 020A |
| 12:01:15 | ENROUTE | (0874) 11Y2 , RVB |
| 12:02:41 | PREEMPT | (0874) 11Y2 |
| 12:02:41 | EXCHANGE | 11Y 11X |
| 12:02:41 | ASSIST | (0874) 11X2 #6643 NATAL MEDIC, RICHARD HN:11 #9254 KRESIC MEDIC, STEPHEN HN:11 , VOL CLOSER |
| 12:02:41 | ETA-88 | (0874) 11X2=120540 020D 020A |
| 12:03:05 | * DMSG-NOT-RCVD | (6643) 11X2 |
| 12:03:09 | ENROUTE | (0874) 11X2 |

Initial type:  EDP           Final type:EDP        --- PSYCHIATRIC PATIENT
CRO:#8670 (CR10)  Disp:#0874 (MN3D)  Held ?:NO  Relay:  Segment: 7  Area:M4  Atom:020A
Location: CENTRAL PR W/COLUMBUS CR ,MN


12:03:54    SUPPLEMENT-PD    (D41A) 000ESA2 90Y +
12:04:53  * ONSCENE          (6643) 11X2
12:12:27    CONTACT          (0757) C112 , NRR
12:16:44  * HDSP             (8404) 14 MN 10D2 FOR GED /CREW ,PD ON BOARD
12:16:44  * GIVE-DISPO       (8404) 10D2 82B
12:16:46    SUPPLEMENT-PD    (D06A) 020A 87  +
12:18:21    CLEAR            (0874) C112 87 , MEDX TREATING ONE, ALSO ON EDP
12:24:29  * 10-81            (8404) 10D2
12:31:12  * HDSP             (6643) 14 MN 11X2 FOR GED /CREW ,1 AND 1
12:31:12  * GIVE-DISPO       (6643) 11X2 82A
12:42:12  * 10-81            (6643) 11X2
12:58:15  * 10-89            (8404) 10D2
13:04:39    SUPPLEMENT-PD    (D06A) --STILL OUT--D 2424+
13:15:35    SUPPLEMENT-PD    (D06A) 020A 97H --TO NY--93Q+
13:17:39  * 10-98            (6643) 11X2
13:17:39  * CLOSED

| Executed:5/31/2017 15:19 | Executed by:NYPDFI |
| --- | --- |
| | \TIMONY8 |

 

# New York City Police Department
# Aided Report

## AIDED INFORMATION

| | |
| --- | --- |
| Aided Report #: 00714 | Record Create Date: 6/16/2003 |
| Report Date: 6/15/2003 | Report Precinct: 020 |
| Report Time: 11:45 | MOS Flag: UNKNOWN |
| Occurrence Address: 1 CENTRAL PARK WEST | Occurrence Borough: PATROL BORO MAN NORTH |
| Intersecting Street: | Occurrence Precinct: 020 |
| Cross Street: | Jurisdiction: N.Y. POLICE DEPT |
| Location Of Occurrence: INSIDE OF | Subway Line: |

## VICTIM

| | |
| --- | --- |
| Name: SETH KOSIK | Pedigree: M/W/33 |
| Address | |
| Homeles | |
| Phone N | |

## NOTIFIED

| | |
| --- | --- |
| Date: | Time: |
| Name: | Relation to Victim: |
| Address: | Phone Number: |

## AIDED DETAILS

| | |
| --- | --- |
| Aided Category | ACR #: 1805289 |
| Aided Refused: NO | PCR #: 7629 |
| City Involved: MANHATTAN | Agency: 000 |
| Removed To: NY HOSPITAL | Mouth to Mouth: NO |
| Facility Type: HOSPITAL | Resuscitated: NO |
| Treated By: | Spray Used: NO |
| Report Code: | Misc Reports: |

Narrative: AIDED DID NOT TAKE HIS DEPRESSION MEDS FOR 3 DAYS & BECAME EMOTIONAL

## REPORTING OFFICER

| | |
| --- | --- |
| Name: JASON JANZER | Command: 020 |

Date: 07/01/03                              --- PSYCHIATRIC PATIENT
Initial type:  EDP          Final type: EDP       --- PSYCHIATRIC PATIENT
CRO:#8725 (CRO0)   Disp:# 0871 (MN1D)  Held ?:NO  Relay:  Segment: 7  Area:M2  Atom:013C
Location:  56 IRVING PL ,MN

EXHIBIT C

| 22:54:58 | PDCOMP | (D03A) POSS REQ EMS TO LOC---2ND FLOOR------VOL EDP-----NO ESU |
| | | NEEDED--D2110+ (8725) |
| 22:55:01 | SUPPLEMENT-PD | (D03A) PREVIOUS INCIDENT CODE 10-10Y3+ (8725) |
| 22:56:00 | ENTRY | (8725) PDT |
| 22:56:03 | FINAL | (8725)ACK SENT TO PD |
| 22:58:23 | SUGG-UNITS1 | (0871) %07B3  Dual %02A3 %08C1 %07N3 !06K3 |
| 22:58:23 | SUGG-UNITS2 | (0871) ~06V3 !08T3  Dual %09W1 |
| 22:58:23 | SUGG-UNITS3 | (0871) ~06V3 !08T3 %07B3  Dual %02A3 %08C1 |
| 22:58:23 | ASSIGNED | (0871) 07B3 #1367 OSGOOD EMT-D, ELIZABETH BATT-08 #2417 JOHNSON EMT |
| | | BATT8,RONALD |
| 22:58:23 | ETA-88 | (0871) 07B3=230122 013G 013C |
| 22:58:28 | * DMSG-RECEIVED | (2417) 07B3 |
| 22:59:45 | * ENROUTE | (2417) 07B3 |
| 23:00:12 | SUPPLEMENT-PD | (D41A) ESU NOTED D 1414+ |
| 23:02:12 | SUPPLEMENT-PD | (D03A) 013A 98  + |
| 23:02:17 | SUPPLEMENT-PD | (D03A) 013SP43 98  + |
| 23:05:26 | PDEMS | (D03A) --BETTER ETA PLZ---+ |
| 23:08:53 | * ONSCENE | (2417) 07B3 |
| 23:20:29 | * HDSP | (2417) 14 MN 07B3 FOR GED /CREW |
| 23:20:29 | * GIVE-DISPO | (2417) 07B3 82B |
| 23:20:47 | SUPPLEMENT-PD | (D03A) 013SP41 87  NY HOSP---PROS AUTO+ |
| 23:26:57 | * 10-81 | (2417) 07B3 |
| 23:29:06 | SUPPLEMENT-PD | (D03A) 013ST1 98  + |
| 23:37:49 | SUPPLEMENT-PD | (D03A) 013SP44 ASSIGNED+ |
| 23:37:50 | SUPPLEMENT-PD | (D03A) 013SP41 98  + |
| 23:49:29 | * ACR | (2417) 07B3 47412291 Y |
| 23:49:50 | * 10-98 | (2417) 07B3 |
| 23:49:50 | * CLOSED | |
| 00:03:04 | SUPPLEMENT-PD | (D03A) 013SP44 97H NY + |

EXHIBIT D



### New York City Health Historical
P.O. Box 27137
New York, NY 10087

**Account #**
**34858052**

## Itemized Statement

| Patient | Trip |
|---|---|
| Kosik, Seth | Date of Service: 07-01-2003 |
| | Dispatch ID Number: 851000449416 |
| City | Pickup: 56 IRVING PL |
| | Destination: New York Presbyterian Hospital Weill Cornell |

### Itemized Charges

| Description | Unit Cost | Units | Amount |
|---|---|---|---|
| BLS CHARGE | 420.00 | 1 | 420.00 |
| BLS MILEAGE | 6.00 | 2 | 12.00 |

### Account Detail

| Transaction | Scan # | Post Date | Amount |
|---|---|---|---|

### Account Summary

| Total Charges | Total Payments | Assign/Adjust | Balance Due |
|---|---|---|---|
| $432.00 | $0.00 | $0.00 | $432.00 |

EXHIBIT E

# FDNY AMBULANCE CALL REPORT 13

NO. 4741229 1

| Date MMDDYYYY | Unit | Unit Type Check | Shield Driver | Shield Tech | CAD No | Responded From |
|---|---|---|---|---|---|---|
| 0 7 0 7 2 0 0 3 | 0 7 1 3 | ALS ✓ | 2417 | 1367 | 134104 | 14/ AVC |

| Call Location | Boro | Apt | PD Badge Number | Precinct | Call Type |
|---|---|---|---|---|---|
| 56 Irving Pl | M | | 7020 | 13 | GDP |

| Patient's Last Name | First Name | Sex | Age | DOB MMDDYYYY |
|---|---|---|---|---|
| KOISISKI | SEITH | ☒M ☐F | 33 | 10 19 1965 |

| Home Address | Apt. | Social Security Number | REC'D |
|---|---|---|---|
| UTO | | | |

CHIEF COMPLAINT: " I want my freedom "

MILEAGE

PRESENTING PROBLEM

MEDICAL   If more than one is checked, circle the primary problem

☐Airway Obstruction ☐CVA / TIA ☐Hemorrhage ☐Respiratory Distress ☐Overdose:
☐Abdominal Pain ☐Dehydration ☐Nausea / Vomiting ☐Respiratory Failure
☐Allergic Reaction ☐Dizziness ☐Newborn ☐Respiratory Arrest Substance
☐Altered Mental Status ☐Environmental ☐Obvious Death ☐Seizure ☐Poison:
☒Behavioral ☐Haz-Mat ☐Cold Exposure ☐Ob / Gyn. ☐Labor ☐Shock
☐Cardiac Arrest ☐General Malaise ☐Syncope Substance
☐Chest Pain ☐GI / GU Bleed ☐Psychotic / Suicidal ☐Unconscious ☐Other

INDICATE ALL THAT APPLY FOR MEDICAL OR TRAUMA
Onset: Acute
Pain:
Quality:
Radiation:
Severity: ☐Mild ☐Mod. ☐Severe
Duration:

TRAUMA  Location ☐Anterior ☐Posterior  Type:
☐Amputation ☐Burn ☐Thermal ☐Chemical ☐Electrical ☐Cardiac Arrest ☐C.N.S. ☐Crush ☐FX/Dislocation
☐Head Trauma ☐Hemorrhage ☐Impaled Object ☐Paralysis ☐Shock ☐Soft Tissue ☐Other:

MECHANISM OF INJURY
☐Assault ☐Cold ☐Domestic Violence ☐Fall ☐G.S.W ☐Hazardous Materials ☐Suspected Child Abuse
☐Heat ☐Machinery ☐MVA. Seatbelts ☐Yes ☐No ☐Pedestrian Struck ☐Stab ☐Other ☐Suspected Elder Abuse

ASSESSMENT

HISTORY ☐Denies
☐Amputee ☐Asthma ☐Bed Confined ☐Cancer ☐CHF ☐COPD ☐CVA / TIA ☐Diabetes ☐Dialysis
☐Frail/Debilitated ☐HIV/AIDS ☐Hypertension ☐Incontinent ☐IVDA ☐Seizures ☐TB ☐Wheelchair Confined ☒Other Psych

MEDICATIONS ☐Denies ☒Unknown ☐Non Compliant     ALLERGIES ☐Denies ☒Unknown

| TIME | B.P. | PULSE | RESP. | GCS | TRAUMA # | SKIN | SKIN TEMP | SKIN COLOR | PUPILS | MENTAL STATUS |
|---|---|---|---|---|---|---|---|---|---|---|
| 23:1 | 132/86 | 72 | 18 | 15 | 12 | Normal ☒ Moist ☐ Dry ☐ | Normal ☒ Warm ☐ Cool ☐ | Normal ☒ Pale ☐ Cyanotic ☐ Flushed ☐ Jaundice ☐ | Normal ☒ Dilated ☐ R Larger ☐ L Larger ☐ Constricted ☐ Unreactive ☐ | Alert ☒ Verbal ☐ Painful Stimus ☐ Unresponsive ☐ |
| 23:16 | 130/84 | 72 | 18 | 15 | 12 | | | | | |

TREATMENT

AIRWAY
☐Abdominal/Chest Thrust
☐Modified Jaw Thrust
☐Hyperextension
☐Oral / Nasal
☐Suction
☐DeLee

OXYGEN THERAPY
☐Bag Valve Mask w/ O₂
☐Mouth to Mask
☐Cannula
☐Non-Rebreather
☐Nebulizer
L.P.M _____

IMMOBILIZATION
☐Backboard: ☐Long ☐Short
☐KED ☐Cervical Collar
☐Splint. ☐Fixation ☐Traction
☐Head Immobilizer
☐Other:

BLS and ALS INTERVENTIONS
☐Albuterol ☐I.V. ☐I.O. ☐Saline Lock
☐Control Bleeding ☐Aspirin ☐Monitor ☐Defibrillate ☐12 Lead
☐CPR ☐SAED ☐Cardiovert ☐Pacing ☐Draw Blood
☐Epi-Pen ☐ET Tube ☐NG Tube ☐Drug Therapy
☐Heat/Cold Application ☐Chest Decompression ☐Needle Cricothyroidotomy ☐ET Confirm
☐Ipecac ____cc P.O. ☒ALS ASSESSMENT PERFORMED
☐Insta-Glucose ☐Irrigation ALS Provided By: ☐FD ☐Vol. ☐Other
☐Other

Presumptive Diagnosis  Behavioral

Patient Condition: ☐Critical ☐Unstable ☐Potentially Unstable ☒Stable
☐DOA ☐Rigor mortis ☐Extreme Dependent Lividity ☐Obvious Death ☐Decomposition ☐DNR

COMMENTS

| TIME | EKG RHYTHM / MEDICATION(S) | TREATMENT / RESPONSE |
|---|---|---|

Found 33 y/o ♂ AAOx3. Pt was a missing person from HB 19. Pt was with PD and transported back to HB 19 with PD and EMS. AAOx3 BP Dizzy ☐ Nausea
Nothing noted during Pt. A&O with unremarkable trauma or distress

☐Continued

| On-Line Medical Control Channel: | On-Line Medical Control Physician | Number | Termination Time | Controlled Substance | Amount Administered |
|---|---|---|---|---|---|

| C.S. Administered By Name/Shield | Signature | URN | Amount Wasted | Witness Name/Title/Signature |
|---|---|---|---|---|

Removed to Vehicle By
☐Chair ☒Walked ☐Carried
☐Scoop/Flat/Stretcher
☐Met at Ambulance

Transported From
☐Residence ☒Public Scene
☐Nursing Facility
☐Res./Cust. Facility
☐Other:

Transport Position
☐Supine ☒Sitting
☐Prone ☐Restrained
☐Shock
☐Semi / Full Fowlers
☐Left Lateral Recumbent

Lights & Siren Used
☒To Scene
☐To Destination

Patients Transported by this Vehicle
☒Transported to Hospital
☐Transported to Morgue
Hospital Destination  14

Hospital Selection
☒Nearest ☐Pt. / Fam Choice
☐OLMC Contact ☐Specialty Referral
☐Hospital Diversion from ____

Patient Not Transported by this Vehicle
☐Assisted in Transport With (Unit #):
☐Transferred/Relinquished Care To (Unit #)
☐RMA/AMA
☐Pronounced on Scene
☐Triage/On Line Medical Control
☐Other:

| ED Chart No. | Insurance ID Number | Hospital Receiving Agent - Signature | Time | | Medicare ☐Medicaid ☐Blue Cross ☐Commercial Insurance ☒Self Pay | Work Related ☐Yes ☒No |
|---|---|---|---|---|---|---|

I request health insurance information for myself or my dependant

FDNY Supervisor Shield  123  Date 07/07/03

EMSC 102.15 01 (02/02)     AMBULANCE COPY (To be turned in to ambulance supervisor)

**PATIENT INFORMATION DISCLOSURE AND ASSIGNMENT OF CLAIM**

I acknowledge that I have been given the Notice of Privacy Practices and Patient Information Release/Assignment of Claim, set forth on the Patient Copy of this Ambulance Call Report, and have read or been informed of their contents, including the purposes for which my protected health care information will be shared, and my responsibility for any charges for services not covered by my insurance or found to be medically unnecessary.

I hereby authorize, for myself or my dependent(s), the release of medical and other information for the purposes specified, including treatment and billing.

I further authorize and assign payment of Medicare and any other authorized benefits to the NYC Fire Department.

| Patient Signature | Firma del Paciente | |
|---|---|---|
| MOS Signature | Patient Unable to Sign | Patient Refused to Sign |

**DECLARACIÓN DE INFORMACIÓN DEL PACIENTE Y AUTORIZACIÓN PARA EL RECLAMO DEL PAGO POR SERVICIOS BRINDADOS**

Acepto que se me ha informado sobre el Aviso de Practicas de Privacidad y la Divulgación de Información del Paciente para el pago de servicios brindados tal como se estipula en la copia del paciente del Reporte De Ambulancia, y que he leído o se me ha informado de su contenido, incluyendo las razones por las cuales la información privada de mi salud será divulgada, y mi responsabilidad por costos incurridos por servicios no cubiertos por mi seguro medico.

Sirva el presente como autorización propia o de mis dependientes para la divulgación de información medica u otro tipo de información para los propósitos especificados, incluyendo tratamiento y facturación.

Autorizo, además, el pago de Medicare y cualesquiera otros beneficios autorizados al Departamento de Bomberos de la Ciudad de Nueva York (FDNY).

---

**RELEASE/REFUSAL OF MEDICAL ASSISTANCE**

I have been advised and I understand that I require medical assistance, and will be transported to a hospital of my choice, and that my refusal to accept such medical assistance may imperil my health or result in death, but I nonetheless refuse to accept the medical assistance indicated below.

I agree to assume all risks, consequences and costs of my decision not to accept such care, and I release the provider of ambulance service, and its employees, agents and independent contractors, from any liability arising from my decision.

*Medical assistance refused:*

☐ Pre-hospital care (Specify): _____

☐ Transportation to the hospital

| Patient Signature | Firma del Paciente | |
|---|---|---|
| MOS Signature | Patient Unable to Sign | Patient Refused to Sign |

**RECHAZO DE ASISTENCIA MÉDICA**

He sido informado y entiendo que necesito asistencia médica, y que seré trasladado a un hospital de mi selección, y que el no aceptar tal asistencia medica me puede causar problemas de salud más serios y hasta la muerte; sin embargo, rechazo la asistencia medica indicada mas abajo.

Acepto y asumo la responsabilidad por cualquier riesgo, consecuencias y gastos por haber tomado dicha decisión, y exonero al proveedor del servicio de ambulancias, sus empleados, contratistas y/o agentes independientes, de cualquier responsabilidad incurrida como consecuencia de mi decisión.

*Rechazo de asistencia medica:*

☐ Cuidado pre-hospitalario (especifique): _____

☐ Transportación al hospital

---

**OUT OF AREA TRANSPORT / DIVERSION**

I request to be transported to a hospital that is more than 10 minutes from the closest appropriate hospital, or that is on diversion status.

I have been advised and I understand that I may experience delays in my care that may imperil my health.

☐ Hospital requested: _____

| Patient Signature | Firma del Paciente | |
|---|---|---|
| MOS Signature | Patient Unable to Sign | Patient Refused to Sign |

**TRASLADO FUERA DEL AREA DE JURISDICCION**

Solicito ser trasladado a un hospital fuera de la jurisdicción que esta a una distancia, desde yo me encuentro, a más de 10 minutos del hospital más cercano y apropiado.

He sido informado y comprendo que puedan ocurrir atrasos en el recibimiento de atención medica que pueden perjudicar mi salud.

☐ Hospital que se solicita: _____

---

**NON-SOLICITED MEDICAL INTERVENTION PROTOCOL**

Thank you for your offer of assistance. The Emergency Medical Technicians or Paramedics staffing the ambulance are providing pre-hospital emergency medical care under the authority of a medical control physician, in accordance with standing medical orders and medical care protocols established by the Regional Emergency Medical Advisory Committee for the New York City Region (REMAC).

To avoid confusion and to ensure proper patient care, a physician should not intervene in the care of an ambulance patient, unless:

1    the physician is capable of providing more advanced emergency care at the scene; AND
2    the Emergency Medical Technicians or Paramedics staffing the ambulance have accepted such intervention; AND
3    such intervention has been authorized by the On-line Medical Control physician

Under REMAC procedures, if you intervene in the care of an ambulance patient, you are assuming management of the patient and will be responsible for the care of the patient until such time as patient management is accepted by the hospital to which the patient is transported. You must therefore accompany the patient in the ambulance to the hospital, sign the patient's Ambulance Call Report, and provide your medical license information.

If you have any further questions, please ask to speak with the On-Line Medical Control Physician.

I have read and understand the above and I accept full responsibility for the pre-hospital medical treatment that I provide to this patient, and I will continue to provide patient management until responsibility for patient care is assumed by the hospital to which the patient is transported.

| Physician's Name | Physician's Signature | License # | Affiliation |
|---|---|---|---|



Case 1:17-cv-06258-CM   Document 5-2   Filed 02/11/11   Page 48 of 58

EXHIBIT F

**2003 Year-End Summary**
Includes charges from January 1 through December 31, 2003

Prepared for
**SETH KOSIK**

Account Number
**3713-807633-83004**

## Auto

| | | | | | Total Spending |
| --- | --- | --- | --- | --- | --- |
| | | | | | **$85.80** |
| Category/Date | Month Billed | Transaction | | Charges $ | Credits $ Bus./Per |

**Gas**

| | | | | | |
| --- | --- | --- | --- | --- | --- |
| 03/15/03 | April | HESS 32541      NORTH BABYLO    NY | | 19.40 | ☐ |
| 03/21/03 | April | CITGO 7-ELEVEN 20982BOYNTON BEACH    FL | | 24.40 | ☐ |
| 12/19/03 | Jan 2004* | SUNOCO   0268277100NEWPORT       RI | | 21.26 | ☐ |
| 12/20/03 | Jan 2004* | 243 WEST AVE     STAMFORD      CT | | 20.74 | ☐ |
| | *This end-of-year charge appeared on your January 2004 billing statement. | | **Subtotal** | **85.80** | |

## Cash/Fees

| | | | | | Total Spending |
| --- | --- | --- | --- | --- | --- |
| | | | | | **$395.00** |
| Category/Date | Month Billed | Transaction | | Charges $ | Credits $ Bus./Per |

**Card Membership**

| | | | | | |
| --- | --- | --- | --- | --- | --- |
| 07/12/03 | August | ANNUAL MEMBERSHIP FEE SETH KOSIK | | 395.00 | ☐ |
| | | | **Subtotal** | **395.00** | |

## Other

| | | | | | Total Spending |
| --- | --- | --- | --- | --- | --- |
| | | | | | **$17,284.1** |
| Category/Date | Month Billed | Transaction | | Charges $ | Credits $ Bus./Per |

**Entertainment**

| | | | | | |
| --- | --- | --- | --- | --- | --- |
| 07/13/03 | August | TELECHARGE SVCE   NEW YORK       NY | | 320.50 | ☐ |
| 07/14/03 | August | #197 LOEWS E-WALK   NEW YORK      NY | | 20.00 | ☐ |
| 07/17/03 | August | ASTOR PLACE THEATER NEW YORK     NY | | 120.00 | ☐ |
| 09/06/03 | September | MUVICO PALACE 20   BOCA RATON     FL | | 21.50 | ☐ |
| 09/15/03 | October | NEIL SIMON THEATRE NEW YORK NY | | 200.00 | ☐ |
| 09/21/03 | October | #116 LINCOLN SQUARE NEW YORK      NY | | 20.00 | ☐ |
| 09/28/03 | October | FANDANGO/LOEWS007011LOS ANGELES     CA | | 23.00 | ☐ |
| 11/02/03 | November | UA UNION SQUARE 14  NEW YORK      NY | | 10.00 | ☐ |
| 11/04/03 | November | UA UNION SQUARE 14  NEW YORK      NY | | 10.00 | ☐ |
| 11/09/03 | November | AMC      000055NEW YORK        NY | | 20.00 | ☐ |
| 11/27/03 | December | AMC      000055NEW YORK        NY | | 10.00 | ☐ |
| 11/27/03 | December | CLEARVIEW-CHELSEA WENEW YORK        NY | | 11.00 | ☐ |
| | | | **Subtotal** | **786.00** | |

**Health Care**

| | | | | | |
| --- | --- | --- | --- | --- | --- |
| 02/07/03 | March | CONCEPT MEDICAL   LAKE WORTH     FL | | 475.00 | ☐ |
| 02/26/03 | March | MANHATTAN ORTHOPDICSNEW YORK      NY | | 225.00 | ☐ |
| 06/12/03 | July | DELRAY COMMUNITY HOSDELRAY BEACH    FL | | 70.00 | ☐ |
| 06/28/03 | July | N.Y.P GUEST FACILITYNEW YORK       NY | | 200.00 | ☐ |
| 07/16/03 | August | NY HOSP/PAYNE WHITNENEW YORK      NY | | 2,505.00 | ☐ |
| 07/23/03 | August | NY HOSP/PAYNE WHITNENEW YORK      NY | | 1,002.00 | ☐ |
| 09/26/03 | October | TEAM HEALTH PLANTATIPLANTATION     FL | | 63.60 | ☐ |
| 10/01/03 | October | DELRAY COMM HOSP   DELRAY BEACH    FL | | 55.76 | ☐ |
| 10/08/03 | October | DR STUART H BLANKMANNEW YORK      NY | | 80.00 | ☐ |
| 11/11/03 | December | BRITE SMILE NYC   NEW YORK      NY | | 75.98 | ☐ |
| 11/12/03 | December | BRITE SMILE OFFICE  WALNUT CREEK    CA | | | 525.00 ☐ |
| 11/12/03 | December | BRITE SMILE OFFICE  WALNUT CREEK    CA | | 525.00 | ☐ |
| 11/18/03 | December | EQUINOX COLUMBUS CENNEW YORK      NY | | 3,025.00 | ☐ |
| 12/02/03 | December | STUART M BERNSTEIN DNEW YORK CITY   NY | | 300.00 | |
| | | | **Subtotal** | **8,602.34** | 525.00 |

**Charities**

| | | | | | |
| --- | --- | --- | --- | --- | --- |
| 07/17/03 | August | 1991 CLASS DUES   ITHACA       NY | | 180.00 | |
| 09/25/03 | October | CONGREGATION SHAARE NEW YORK      NY | | 360.00 | |
| | | | **Subtotal** | **540.00** | |

EXHIBIT G

From: **Seth Mitchell** seth.mitchell@ashemllc.co 📎
Subject: Goldman Sachs Compensation, Benefits, and Entitlements (Urgent action required)
Date: March 7, 2016 at 13:43
To: GMSAmericas@ny.email.gs.com
Cc: edith.cooper@gs.com
Bcc: Seth Mitchell seth.mitchell@ashemllc.co

Dear GMS,

Thank you for the Firm's continued time and attention with the resolution of my ongoing crisis, in concert with the Government of the United States of America.

To get right to it:

Goldman Sachs has submitted evidence to the Government of the United States that my employment period with the Firm under the ISP was from 2001 - 2006, as per the attached:

Replied to this message on 4/29/2015 8:06am

1ohj gs-comp-acctg-█████████████████

RE: MR. SETH MITCHELL █████████████████

███████████████████

In response to your request below, please be advised that from 2001-2006, Mr. Mitchell was employed in Hong Kong by Goldman Sachs Asia LLC.  For the period noted in your email, this entity was treated as a partnership, ████████████████████████████████████████████████████
Code ████████████████████████████████████████mployer and therefore was not subject ████████████████████

If you have any further questions, please do not hesitate to contact us.

Thanks--



As such, the determination/measurement period for any outstanding Firm-wide benefits and entitlements **must** be for **at least** this five (5) year period.

Additionally, kindly find attached a recent communique from Social Security Administration, regarding a Goldman Sachs Pension benefit that is currently due me — I respectfully request that I receive a lump-sum payout under this Pension Benefit as soon as possible, as well as an investigation into what other compensation, benefits, and entitlements are owed to me, from a historical perspective:

*ERISA REQUEST 29USC §1132.C1*

# Social Security Administration
## Potential Private Pension Benefit Information

Refer to: S2BC3
Date: February 25, 2016

Seth Mitchell
208 East 51st Street
Suite 391
New York, NY 10022

Dear Mr. Mitchell,

Enclosed is a Notice of Potential Private Pension Benefits containing the information you requested. This is the only pension information in our files.

When a person leaves a job covered by a private pension plan before retirement age, but has earned a right to future pension benefits under the plan, such benefits are called "deferred vested benefits." We maintain this information about persons who have deferred vested benefit rights with private pension plans. We give this information to these persons (and their dependents or survivors) upon request, or automatically when they apply for Social Security benefits.

We have information about a participant's right under a pension plan only after he or she either:

* Stops working under the plan,
* Has had a break in service of a specified period within the plan.

Plan Administrators have up to 7 months after the close of the plan year to file a deferred vested rights report. This information should be available in our records about 15 to 18 months after the end of the plan year.

The information we gave you applies only to deferred vested benefit rights under private pension plans. It does not apply to your Social Security earnings record nor any Social Security benefits to which you may be entitled.

Please contact the Plan Administrator listed in the notice to apply for any benefits which

may be due, or for any additional information.

We apologize for the delay in answering your letter.

Social Security Administration

Enclosure

---

# Social Security Administration
## Potential Private Pension Benefit Information

SETH MITCHELL
208 EAST 51ST STREET
SUITE 391
NEW YORK  NY 10022

Social Security Number

Name

S.  KOSIK

We are writing to tell you that you, or the worker whose Social Security number appears at the top of this form, MAY be entitled to some private pension benefits upon retirement. Also, your family, or the worker's family, may be entitled to retirement or survivor benefits.

### These Are Not Social Security Benefits

These potential benefits are NOT Social Security benefits and we do not make any decisions about the payment of these benefits. The following provides some basic information about these private pension benefits.

### Information About Pension Benefits

You have , or the worker has, earned pension rights although no longer employed in a job covered by the pension plan. These are called "deferred vested benefits." Private pension plan administrators must provide information about such benefits to us through the Internal Revenue Service. We provide this information about the pension plan when the individual asks for it or when a claim is filed for Social Security benefits.

### If You Want to Apply for These Benefits

If you want to apply for these pension benefits or have any questions, you should contact the pension Plan Administrator shown below. Include the 9 digit identification number shown below and a copy of this notice when you write to the Plan Administrator.

| Plan Name GOLDMAN SACHS EMPLOYEES' PROFIT SHARING RETIREMENT INCOME PLAN | Plan Number 13-4019460-001 | |
|---|---|---|
| | Identification Number 13-4019460 | |
| | Year Reported 2002 | Estimated Amount |
| Plan Administrator and Address THE GOLDMAN SACHS GROUP, INC. % COMPENSATION ACCOUNTING | Type of Annuity A | Payment Frequency A |

| 30 HUDSON STREET, 19TH FLOOR JERSEY CITY NJ 07302 | Units or Shares | Value of Account |
|---|---|---|
| | | $131,378.07 |

**IMPORTANT:** This is all the information we have. See other side of this page for an explanation of this information

| For SSA Use Only: | 04-015-50-023 | 2016056 |
|---|---|---|

Form SSA-L99 (9-97)

Thank you,
Seth

Respectfully and very truly yours,

Seth Mitchell, CFA
Partner & Managing Member

A S H E M   L L C   X

1.646.801.2045 (DIRECT)
1.917.591.7059 (FAX)

Confidentiality Notice: This email, including attachments, may include non-public, proprietary, confidential or legally privileged information. If you are not an intended recipient or an authorised agent of an intended recipient, you are hereby notified that any dissemination, distribution or copying of the information contained in or transmitted with this e-mail is unauthorised and strictly prohibited. If you have received this email in error, please notify the sender by replying to this message and permanently delete this e-mail, its attachments, and any copies of it immediately; you should not retain, copy or use this e-mail or any attachment for any purpose, nor disclose all or any part of the contents to any other person.  Your attention is greatly appreciated.

© 2016 Ashem LLC

EXHIBIT H

# Informational Notice

**Goldman Sachs**

## Human Capital Management
Reward | Benefits

March 17, 2016

Seth Mitchell

The following table details your history of coverage under the Goldman Sachs employee benefit plans ("Plans").

| Group Health Plan | Coverage Category | Coverage Begin Date | Coverage End Date |
|---|---|---|---|
| Alico Indemnity | Individual | 8/1/2001 | 11/30/2003 |
| Vision | Individual | 1/1/2002 | 11/30/2003 |
| LTD – | | | |
| $74,400 | | 8/1/2001 | 12/31/2001 |
| $174,400 | | 1/1/2002 | 12/31/2002 |
| $180,000 | | 1/1/2003 | 11/30/2003 |
| Basic Life – $150,000 | | 7/3/2001 | 11/30/2003 |
| PAI - $1,000,000 | Individual | 8/1/2001 | 11/30/2003 |
| BTA – | | | |
| $750,000 | | 7/3/2001 | 12/31/2001 |
| $2,000,000 | | 1/1/2002 | 11/28/2003 |
| HC FSA - $250 | | 7/3/2001 | 12/31/2001 |

During your employment with Goldman Sachs, you participated in the Goldman Sachs Employees' Pension Plan and accrued a monthly pension benefit of $125.00 under the Single Life Annuity form of payment starting at

Your balance under The Goldman Sachs 401(k) Plan was depleted in full via the following payments to you:

| Date | Gross Distribution Amount |
|---|---|
| 12/31/2008 | $130,298.65 |
| 12/31/2009 | $     458.64 |

EXHIBIT I



**Susan Wantland, SCLA**
**Major Loss Examiner - Personal Accident Claims – Americas Region**
**Consumer Lines/AIG Property Casualty**

17300 W. 119th Street, Olathe, KS 66061

1 913 495 3278 Direct Line
1 800 551 0824 Toll Free
1 913 213 8204 Cell
1 866 741 4929 Facsimile
**Susan.Wantland@aig.com**

**Personal Accident Insurance**
**PO Box 25987**
**Shawnee, Mission, KS 66225**
**www.aig.com**
*visit us at:*
*http://www.aig.com*

*Delivering Technical & Service Excellence...Every Day!*
**IMPORTANT NOTICE:**
**The information in this email (and any attachments) is confidential. If you are not the intended recipient, you must not use or disseminate the information. If you have received this email in error, please immediately notify me by "Reply" command and permanently delete the original and any copies or printouts thereof. Although this email and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by AIG for any loss or damage arising in any way from its use.**

**From:** Daly, James L. [mailto:James.Daly@gs.com]
**Sent:** Friday, November 18, 2016 11:34 AM
**To:** 'Mark Telling'; Wantland, Susan
**Cc:** Carrie Grecich
**Subject:** RE: 061-107492 & 061-107493 Goldman Sachs / Seth Mitchell

Apologies for the delay, please see Seth's dates of PAI coverage below:



#2



**Coverage Detail**

| Coverage | Carrier | Network | Coverage Amount | Incr. |
|---|---|---|---|---|
| 1    -Ind Coverage | AHLA   -AHLA | | 1000000.00 | 0 |

Let me know if you need anything else.

Thanks,
James

**From:** Mark Telling [mailto:MTelling@Frenkel.com]
**Sent:** Tuesday, November 15, 2016 12:58 PM
**To:** 'Wantland, Susan'; Daly, James L [HCM]
**Cc:** Mark Telling; Carrie Grecich
**Subject:** RE: 061-107492 & 061-107493 Goldman Sachs / Seth Mitchell

Hi James

As you can see below, Susan Wantland from AIG needs some additional information on Seth
Mitchell's claim.

Please cc me on your responses to Susan and let me know if you have any questions

Thanks

Mark Telling
Senior Vice President
Frenkel Benefits, LLC
350 Hudson Street, 4th Floor
New York, NY  10014

Ph (212) 488-0268
Cell (917) 691-1836

**From:** Wantland, Susan [mailto:Susan.Wantland@AIG.com]
**Sent:** Tuesday, November 15, 2016 12:26 PM
**To:** Mark Telling
**Subject:** 061-107492 & 061-107493 Goldman Sachs / Seth Mitchell

I need detail and clarification as to the dates Seth Mitchell was covered under the PAI policy. An
Informational Notice letter dated March 17, 2016 from Goldman Sachs, a copy of which I
attached to this email,  was attached to the insurance department complaint which shows he
had coverage under the PAI of $1,000,000 Individual coverage beginning 8/1/2001, but there is
no entry for 2002 or 2003 like there are for other benefits, nor is there an end date. However,
an email from James Daly of Goldman Sachs dated 5/23/16, which I copied below, states he

an email from James Daly of Goldman Sachs dated 5/23/16, which I copied below, states he
was enrolled in PAI from 1/1/2003 to 11/30/2003 with $1M coverage. Was he covered under
the PAI coverage from 8/1/2001 to 11/30/2003? I need screen prints of enrollment or election
information, something in writing which shows the dates he was enrolled in coverage.

Thanks.

FROM: DALY, JAMES L. [MAILTO:JAMES.DALY@GS.COM]
SENT: MONDAY, MAY 23, 2016 4:29 PM
TO: 'MARK TELLING'
CC: CARRIE GRECICH; BATSON, RAQUEL; EXT--DAVID, KLEIN
SUBJECT: RE: GOLDMAN SACHS - AIG CLAIM QUESTIONS

HI MARK,

APOLOGIES FOR THE DELAY, SETH MITCHELL WAS HIRED ON 7/3/2001 AND LEFT THE FIRM
11/29/2003.  HE WAS ENROLLED IN PAI FROM 1/1/2003 TO 11/30/2003 WITH A $1M
COVERAGE AMOUNT.  HE IS NOT CURRENTLY ELIGIBLE FOR ANY BENEFITS.

#1

SETH HAS REPEATEDLY CONTACTED GS ASKING FOR INFORMATION ON HIS CURRENT BENEFITS,
OF WHICH HE HAS NONE, AND HE RECENTLY ATTEMPTED TO FILE AN LTD CLAIM.  GS HAS
INSTRUCTED GS HR DIRECT, AS WELL AS SOME OF OUR PROVIDERS, TO HAVE NO CONTACT
WITH HIM.  NO ADDITIONAL INFORMATION SHOULD BE SHARED WITH HIM CONCERNING GS
BENEFITS.

LET ME KNOW IF YOU HAVE ANY QUESTIONS.

THANKS,
JAMES

FROM: MARK TELLING [MAILTO:MTELLING@FRENKEL.COM]
SENT: MONDAY, MAY 23, 2016 2:12 PM
TO: DALY, JAMES L [HCM]
CC: CARRIE GRECICH; 'BATSON, RAQUEL'; DAVID KLEIN; MARK TELLING
SUBJECT: GOLDMAN SACHS - AIG CLAIM QUESTIONS

HI JAMES

RAQUEL FROM AIG THAT IS CCED ABOVE JUST ASKED US FOR AN UPDATE ON THE SETH
MITCHELL PAI AND BTA CLAIMS.

PLEASE LET US KNOW IF YOU HAVE ANY ADDITIONAL INFORMATION ON THE INFO DETAILED
BELOW.

THANKS FOR YOUR HELP

MARK TELLING

SENIOR VICE PRESIDENT
FRENKEL BENEFITS, LLC
350 HUDSON STREET, 4TH FLOOR
NEW YORK, NY  10014

PH (212) 488-0268
CELL (917) 691-1836

**Susan Wantland, SCLA**
**Major Loss Examiner - Personal Accident Claims – Americas Region**
**Consumer Lines/AIG Property Casualty**

17300 W. 119th Street, Olathe, KS 66061

1 913 495 3278 Direct Line
1 800 551 0824 Toll Free
1 913 213 8204 Cell
1 866 741 4929 Facsimile
**Susan.Wantland@aig.com**

**Personal Accident Insurance**
**PO Box 25987**
**Shawnee, Mission, KS 66225**
**www.aig.com**
*visit us at:*
***http://www.aig.com***

*Delivering Technical & Service Excellence...Every Day!*

**IMPORTANT NOTICE:**
**The information in this email (and any attachments) is confidential. If you are not the intended recipient, you must not use or disseminate the information. If you have received this email in error, please immediately notify me by "Reply" command and permanently delete the original and any copies or printouts thereof. Although this email and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by AIG for any loss or damage arising in any way from its use.**

*This email from Frenkel Benefits, LLC d/b/a Frenkel & Company and/or its affiliates ("Frenkel") is for the sole use of the intended recipient(s) and may contain confidential and/or privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email immediately and destroy all copies of the original message.*

*Nothing contained herein constitutes nor is intended to constitute an offer, inducement, promise, or contract of any kind and/or a statement that any data contained herein is error free. Please also note that no changes can be made to any existing insurance contracts, and that new coverage cannot be bound, via an email (or voice mail) directed by its policyholder clients to a Frenkel representative. Likewise, Frenkel does not provide legal advice and this email should not be relied upon as such.*

*Frenkel provides various insurance-related services, including facilitating the purchase of*

EXHIBIT J

 **Prudential**

**Donna Racioppi**
Disability Claims Specialist

The Prudential Insurance Company of America
Disability Management Services
PO Box 13480
Philadelphia, PA 19176

Phone:  (800) 842-1718  Ext: 87359
Fax: (877) 889-4885
**Website:  www.prudential.com/mybenefits**
**Web Access Code:**

May 31, 2016

Seth Mitchell
208 East 51st Street
Suite 391
New York, NY  10022

Claimant: Seth Mitchell
Claim No.: 12196058
Control No. 44048
Plan effective date: 1/1/05

Dear Mr. Mitchell:

It was a pleasure speaking with you today.  As we discussed, Prudential became the Long Term Disability insurance carrier for Goldman Sachs effective January 1, 2005.

As indicated in the claimant statement you provided to Prudential and in your conversation with our office today, you went out of work in 2003.  As this is prior to our plan effective date, you would not be covered under this Group Plan.

If you have any questions, please contact us directly at the phone number listed above.

Sincerely,

*Donna Racioppi*
Donna Racioppi
Disability Claims Specialist